[No. 38456.   Department Two.   May 12, 1966.]

*In the Matter of the Welfare of* DEBRA ANN TODD, *Petitioner,*
v. THE SUPERIOR COURT FOR KING COUNTY, *Donald*
*L. Gaines, Judge, Respondent.*\*

*Arthur A. Giblin,* for petitioner.

*Charles O. Carroll* and *Ned Olwell,* for respondent.

FINLEY, J.—The petitioner herein describes the instant matter as a " 'finish fight' by a Mother to save her child

\*Reported in 414 P.2d 605.

from being permanently taken from her." Cast in less emotional tones, this child custody matter is before the court on a writ of certiorari granted on the petition of the mother of Deborah (Debra) Ann Todd. We granted the writ in order to review an order of the juvenile court declaring Deborah, a 13-year-old girl, to be a dependent child. The order further provided that the mother be deprived of custody, and that custody of the child would remain with the Washington State Department of Public Assistance until further order of the court.

The welfare of Deborah Ann had been before the juvenile court on several occasions, dating back to the summer of 1960. School authorities, social workers, and law enforcement officers had periodically entered petitions to have Deborah declared a dependent. Mrs. Todd steadfastly refused to cooperate with either the school authorities or the social workers of various state agencies. She frequently withdrew her child from enrollment in particular schools in order to "fight" what she construed to be a "conspiracy" against her and her child. She enrolled the child under several different assumed names in various public and private schools, and falsified her school records in her attempts to thwart the "interference" of school and court authorities. Several hearings were conducted by the juvenile court pursuant to the aforementioned petitions, but at each of them it was decided that the child's welfare would be best served by allowing her to remain with her mother, despite the obvious deficiencies in her home environment.

On July 23, 1965, the question of Deborah's welfare was once again before the juvenile court as a result of two petitions. The first petition was submitted by a deputy of the King County Sheriff's Department, alleging that the child was delinquent in that she had vandalized a roof. Apparently, the evidence was somewhat dubious in support of this issue, and this petition was dismissed. The second petition was submitted by a social worker of the State Department of Public Assistance to the effect that the child was "dependent" within the meaning of that term as it is used in the Juvenile Court Act, RCW 13.04.010. The judge

presiding at the juvenile court hearings had the benefit of (a) an extensive and detailed "social file,"[1] which was compiled by the professional staff of the court, as well as (b) the testimony of 10 witnesses, and (c) two psychiatrists' reports, in considering and granting the petition to have the child declared a dependent and made a ward of the state. Although the trial court did not make and enter formal findings of fact, the memorandum decision reveals that the basis of the order of dependency was that the court found that the mother was the victim of paranoid delusions of persecution, and had been trying, with some degree of success, to inoculate the child with similar delusions.

When existing parent-child relationships fail to meet—or allegedly fail to meet—commonly accepted community standards, an intense human drama almost inevitably develops. The apparent conflict between society (in the person of the law enforcement officers and/or the juvenile court officials involved) and the particular family is often exaggerated by the abstractions, preconceptions, and excessively emotional overtones of the actor participants. In this respect it seems to be forgotten that the law and the courts exist simply to interpret, propound, and apply acceptable social policy standards in these and other matters of socially significant human relationships. The law and the members of its official family, particularly the social worker, and oftentimes the juvenile court judge, become the villains in the piece. Paradoxically, these selfsame "villains" are the duly delegated and authorized agents of social policy of whom responsibility and function is not only expected, but is demanded by the very nature of their official status. In this context, one's perspective of the pertinent facts and the applicable law could easily be distorted in the instant case if one became overly concerned and preoccupied with (a) the *fact* and (b) the *manner* of intervention of the juvenile court in the current trials and tribu-

---

[1] The "social file" is a confidential record of psychiatrists' reports, detention records, caseworker files, etc., which is compiled by the juvenile court in every case. In this instance, the file consists of two large volumes of information and background material.

lations of the Todd family.[2] Such a distortion could well be amplified if one gives credence and weight to two un-articulated, but possibly inferential, presumptions which are entertained and advocated by the petitioner herein. The first of these presumptions is that the natural parent who fights for the custody of a child will—simply by virtue of his or her love and affection—provide an adequate home environment. Secondly, there is a presumption exemplified by the petitioner's attitude toward the school authorities and the courts that any person or agency who would seek to sever the parental relationship is, in effect, an officious intermeddler. In our opinion neither assumption is warranted by the facts of the instant matter, or by common experiences. The fact that Mrs. Todd desperately wants to keep Deborah should not prevent appropriate authority from attempting to ascertain whether the Todd home meets minimal standards. We are convinced that the professional personnel of the King County Youth Service Center and the State Department of Public Assistance, as a result of their training and experience, are well aware of, and are significantly guided and influenced by, a policy which recognizes the social or all-round desirability of leaving a child, *if reasonably possible,* in the custody of its natural parents. Furthermore, we believe these professional personnel are oftentimes more competent, or at least better trained and more experienced, in the matter of family relationships and problems than most judges and lawyers. In mentioning

---

[2]With respect to the *manner of intervention* of the juvenile court in the instant matter, it should perhaps be noted that Deborah was originally approached by a King County Sheriff's Deputy for the purpose of having her identify a suspect in a child-abandonment matter. She was subsequently detained at the King County Youth Service Center as a result of the aforementioned allegations of vandalism. Shortly thereafter, the aforementioned delinquency and dependency petitions were presented. Any references to, and arguments based upon, the law of arrest are clearly out of context, because juvenile proceedings are not regarded or treated as criminal in nature. Thus, we do not consider the fact that the Sheriff's Office originally contacted Deborah for a matter unrelated to her thereafter alleged delinquency or dependency to be crucial or determinative of the issues presented by this writ of certiorari.

these considerations and adverting to certain understandable "presumptions," emotional tendencies, and the reluctance of most people to intervene in family affairs, it should be implicit that we will not indulge in any presumption of inevitability or omniscience in favor of juvenile court determinations. Instead, the need is for cautious and, insofar as possible, objective evaluations at all official levels dealing with child welfare matters. However, we are confident that petitions to have a child made a ward of the state are usually resorted to only in the absence of any other rational, practicable solution to the particular problem involved.

Matters of child custody by their very nature present extremely difficult problems to trial and appellate courts, particularly when a natural parent is striving to maintain custody of an offspring in the face of persuasive indications or allegations of dependency or delinquency status. However, the judicial decision-making process still must function and operate in specific instances in the troublesome child custody area as well as in others, reflecting, of course, hopefully insofar as humanly possible, objective evaluation of the facts, the applicable social standards, and the legal issues presented.

■ Thus, irrespective of the natural emotions and sympathy aroused by a mother's tearful plea, the juvenile court and this court on appeal or certiorari must be guided and must function according to one paramount consideration in all child custody cases: *the welfare of the child. Klettke v. Klettke*, 48 Wn.2d 502, 294 P.2d 938 (1956).

In this connection we have often noted what we think is a realistic and rational appellate policy of placing *very strong* reliance on trial court determinations of what course of action will be in the best interests of the child. *Kehus v. Euteneier*, 59 Wn.2d 188, 367 P.2d 27 (1961); *Applegate v. Applegate*, 53 Wn.2d 635, 335 P.2d 595 (1959); *Patterson v. Patterson*, 51 Wn.2d 162, 316 P.2d 902 (1957); *Sweeny v. Sweeny*, 43 Wn.2d 542, 262 P.2d 207 (1953). In *Sweeny, supra*, we outlined the reasons underlying our appellate policy with reference to trial court determinations in child custody questions:

We noted the primary consideration was the child's welfare, followed by the rule that, other things remaining equal, a child of tender years was to be awarded to the mother, if the mother be physically and morally fit. We noted the rule that great weight should be given to the decision of the trial court in custody matters because of the great advantage the trial court enjoys over us in matters of trial atmosphere and opportunity to observe witnesses personally, and to gauge first hand their candor and truthfulness. In the latter connection, obviously, candor and truthfulness do not always appear with crystal clarity from the written record with which we are confronted on appeal. Generally speaking, the crux of the latter principle, boldly stated, is that the trial court is the forum where divorced parents, competing for custody of their children, should expect to win their lawsuits. *In other words, on appeal, we are reluctant to disturb a custody disposition made by the trial court, and we will do so only upon a showing of manifest abuse of discretion by the trial court.* (p. 550.) (Italics ours.)

Although the problem presented in *Sweeny* was custody as between two divorced parents, the same reasoning noted in that context should apply with equal, if not greater, force to determinations in juvenile court hearings respecting alleged dependency or delinquency status of a particular child.

The crux of the petitioner's legal argument herein is that the judge presiding at the juvenile court hearing failed to make any findings that precisely fit the grounds for dependency which are specified in RCW 13.04.010. In addition, the petitioner urges that the evidence submitted at the hearing was not sufficient to establish Deborah's dependency under any of the definitions of RCW 13.04.010; hence, the juvenile court judge would not have been warranted in entering the required findings of fact to support a dependency order.

■ We are not persuaded that the omission of findings of fact is necessarily fatal. We have on previous occasions referred to written memorandum decisions or stenographic transcriptions of oral decisions in order to determine the factual basis for trial court decisions. *Rutter v. Rutter,* 59

Wn.2d 781, 370 P.2d 862 (1962); *Hodges v. Gronvold,* 54
Wn.2d 478, 341 P.2d 857 (1959); *Guerin v. Thompson,* 53
Wn.2d 515, 335 P.2d 36 (1959).

█ Furthermore, we are convinced that subsection (3)
of RCW 13.04.010 is sufficiently broad to encompass the
juvenile court's finding of dependency. Subsection (3)
reads:

> For the purpose of this chapter the words "dependent
> child" shall mean any child under the age of eighteen
> years:

> (3) Whose home by reason of neglect, cruelty or de-
> pravity of his parents or either of them, or on the part
> of his guardian, or on the part of the person in whose
> custody or care he may be, *or for any other reason, is an
> unfit place for such child;* or . . . . (Italics ours.)

The following excerpts from the oral opinion of the juvenile
court judge reveal the basis of his conclusion that the Todd
home was an unfit place for Deborah, and that Deborah
should be made a ward of the court:

> THE COURT: We have this same paranoic pattern through-
> out all her testimony, and it has not changed a bit from
> the problem I had before me five years ago. That is the
> reason I am faced with this problem today. MR. GIBLIN:
> What was paranoid? That means crazy, doesn't it? THE
> COURT: No, not necessarily. I think it means a sense of
> persecution, which she constantly carries, and she has
> been trying, with some degree of success to inoculate the
> child with it. That is what I am so worried about. This
> child is accepting this same pattern, that is the thing we
> are so concerned about here.
> Dr. Heilbrun's conclusions here:
> "Her mask like affect, her unrealistic adjustment to life
> and the persecutory delusions suggested the diagnosis of
> a schizophrenic reaction with paranoid tendencies."

Without delving into or describing explicitly the numerous
portions of the record which overwhelmingly support the
juvenile court judge's (and Dr. Heilbrun's) conclusions
about Mrs. Todd's mental state,[3] suffice it to say that the

---

[3]The following portions of a letter dated November 13, 1965, are
representative of the tragic delusions which Mrs. Todd entertains about

entire record is permeated with evidence demonstrating the mother's disturbed condition—and the resulting adverse effect upon the child.

The portion of subsection (3) of RCW 13.04.010 italicized above, "*or for any other reason, is an unfit place for such child;*" permits the juvenile court judge who is sitting in a dependency matter a wide discretion and latitude in considering whether a particular home environment is a fit place for a child. While the judge presiding in the instant case did not clearly specify in a finding that the Todd home was an "unfit place for such child," his memorandum opinion clearly indicates this was the basis of his determination of dependency. We are not disposed to determine *de novo*

this court, the juvenile court, and other public bodies:

> The Supreme Court,
> Of the State of
> Washington, Olympia,
>
> To The Chief Justice:
>
> I have been viciously affronted with false allegations, in the Supreme Court of the State of Washington.
>
> 1. My child has never been absent from school without a good reason.
>
> 2. How dare you call my home dirty and rob me of my child as a result? No home in this city is safe, if this can happen. . . . .
>
> . . . .
>
> 4. We are not telling the Court who our Dentist back east is because the Juvenile Court and certain officials here in Seattle have been smearing our family by letters with anyone we have known and using their title and office to do so.
>
> 5. How can these officials jail my child, ruin her teeth, and then use teeth as a reason? Why do these officials incarcerate, terrorize and dirty our child up before they hold trial on us? Why do these officials thus destroy evidence of what a lovely, clean, happy, well-reared little girl she is? Why are these officials lies being condoned by the Courts. . . .
>
> . . . .
>
> The Juvenile Court and Barbara Young harrassed my husband to his grave, caused me to lose our unborn child and incarcerated our innocent daughter . . . hopelessly invaded the privacy of our home. . . . Ask our Attorney what happened to our home. . . . our things . . . ? I respect the United States Constitution, not the Devil, who got our child . . . not the Devil who is stigmatizing and defaming our family, to the grave. . . .
>
> Respectfully,
> /s/ Catherine Clark Todd

what course of action would be in the best interests of Deborah (Debra) Ann Todd—at least not in the absence of clear abuse of judicial discretion herein by the juvenile court judge. The delicate and troublesome question of a child's custody is much better determined at the trial court (here, the juvenile court) level, where the decision maker has the opportunity to gauge first hand the credibility and character of the parents, the child, and the professional staff workers involved in the case.

For the reasons indicated herein, we affirm the order of dependency entered by the judge presiding at the juvenile court.

HUNTER, J. and LANGENBACH, J. Pro Tem., concur.

DONWORTH, J., concurs in the result.

ROSELLINI, C. J. (dissenting)—In my opinion, not only did the trial court fail to make a finding that the home of Deborah Ann Todd was an unfit place for her, but the record fails to support such a finding. The majority pay verbal homage to the duty of the court to examine the facts with detachment, but I do not find such an examination in the opinion. I do find a rather zealous summation of the case against the mother, who is undoubtedly suffering from what used to be known as a "persecution complex," and I also find an apparent conclusion that unquestioning faith should be placed in the opinions of social workers, whatever the facts of the case may be.

I agree with the majority that the public has an interest in the welfare of children; but it also has an interest in the preservation and fostering of healthy family relationships. I think the public policy of this state is enunciated in the statute which sets forth the criteria by which the dependency or delinquency of a child can be determined by a court, and that the legislature did not intend to invest in courts an absolute discretion in such matters. It seems to be that the result of the majority's opinion is to rewrite the statute and give to the juvenile court the right to take custody of a child if it feels that the atmosphere of its home

is not absolutely healthy, even though that home may not be an "unfit" place for the child.

I think the words "or for any other reason is an unfit place for such child" must be read in the light of the preceding language—"by reason of neglect, cruelty or depravity of his parents or either of them." Thus it would seem that the "any other reason" should be of a comparably serious nature.

If the bad influence of the mother, in this case, was that serious, it is puzzling to me why the juvenile court did not take custody of the child when the problem first came to its attention. At that time the child was only 8 years of age, and if the course of her development was to be changed, it was not a moment too soon to start the process of changing it. Instead, the juvenile court, while retaining jurisdiction over her, permitted the mother to continue to exercise her influence for 5 years, and then, although there was no change in the child's condition, decided that it was time to remove the daughter from the mother's influence.

It is evident from the record that the daughter does not wish to be separated from her mother; that she regards the juvenile authorities as her "jailers" and she, too, feels unjustly persecuted because of an unjustified interference with her right to be with her mother.

My reading of the record in this case does not disclose a picture quite so bleak as that painted in the majority opinion. However, my dissent is not inspired by this fact, but is grounded on the law which is applicable to the facts before us.

The record does not disclose what program of rehabilitation the juvenile court plans to follow. While finding that the child was beginning to show paranoid tendencies, the court did not order the psychiatric treatment which would be needed to correct these tendencies.

It shows that the mother's problem first came to the attention of the juvenile court in 1960, shortly after she had entered her daughter in school, at the age of 8. The mother attended school with the child and insisted on sitting outside the classroom, consulting with the child about her

lessons and other problems, and generally making a nuisance of herself. As a result, the principal suspended the child from school and notified the juvenile authorities that she presented a disciplinary problem. A hearing was conducted, and the juvenile judge at that time concluded that the child should be made a ward of the court and placed in the temporary custody of her mother.

Complying with the court's order, the mother entered the child in another school and refrained from harassing the teachers. In the years following, the child was moved from school to school several times, and enrolled under assumed names; but only once, apparently, did the mother again attempt to interfere with the school authorities, and this for only a short period of time. But she refused to cooperate with social workers representing the court, whose duty it was to ascertain that the child was receiving a proper education. The mother felt that these representatives of the court were unnecessarily harassing her, and she retaliated with a continuing barrage of irate letters and sometimes telephone calls to the social workers and others whom she felt to be a part of the conspiracy against her.

In spite of the fact that she was living in this unfortunate atmosphere, the child did attend school and made good grades. There was no evidence that she presented a disciplinary problem at school except when her mother attempted to police her education.

Several hearings subsequent to the original hearing were conducted by the juvenile court, and at each of them it was decided that the child's welfare would be best served by allowing her to remain with her mother, in spite of the psychological damage which could be expected to result from her mother's influence.

In July, 1965, the question of her welfare was again brought before the court on two petitions. A petition by Gordon Hartshorn of the King County Sheriff's Department alleged that the child was delinquent in that she did vandalize a roof. The evidence did not support this allegation, and this petition was dismissed. Another petition, by Bar-

bara E. Young, a social worker in the employment of the State Department of Public Assistance, alleged that the child was dependent.

In support of this petition, evidence was offered that the child had been absent from school for several weeks. However, these absences were explained by illness, on which there was testimony by the family doctor, and the death of her stepfather. The court did not find that she had been absent from school without good cause. Evidence also showed that the care of her teeth had been sadly neglected and that she was in need of immediate and extensive dental care. The mother had refused to have this work done, even though the social worker had offered to arrange for the dental work to be done with little or no expense to the mother. This refusal, coupled with the fact that the mother exhibited no willingness to utilize any available source of assistance in this regard, was one of the factors which the court took into account in deciding that the mother should be deprived of the custody of the child.

Aside from her problem with her teeth, Deborah was in good health, and there was no showing that she was not well cared for physically. There was no showing of delinquent conduct on her part; and, in fact, the evidence was that she was an intelligent and well-behaved child, although she was undoubtedly affected by her mother's preoccupation with her feelings of persecution. Her mother did not neglect her; on the contrary, she was devoted to her.

The petitioner does not question the court's power to order that dental care be provided for the child. Furthermore, we are advised that the teeth have been taken care of; and the issue, had it been raised, would now be moot. The question before the court, therefore, is whether the superior court may declare a child dependent and deprive the parent of custody on the sole ground that the parent is mentally or emotionally disturbed.

As the majority state, the trial court is vested with a wide discretion in matters affecting the welfare of a minor child. *In re Three Minors,* 50 Wn.2d 653, 314 P.2d 423 (1957). Thus, we must accept the trial court's finding,

embodied in its memorandum opinion, that the mother's disturbed condition had an adverse effect on the child's attitude toward life, and this fact is certainly supported by the record. However, in my opinion, this finding will justify a declaration of dependency only if it constitutes a ground for such a declaration, as the grounds are set forth in the applicable statute, RCW 13.04.010.

The only statutory grounds relied upon by the respondent in support of the juvenile court's decision are subsections (2), (3), (9) and (12). Under subsection (2), a dependent child is one "Who has no parent, guardian or other responsible person; or who has no parent or guardian willing to exercise, or capable of exercising, proper parental control." There is no finding or evidence that the mother of Deborah refused or failed to exercise parental control; and this provision is, therefore, inapplicable.

Subsection (3), upon which the majority base their decision and to which I have referred above, defines such a child as one "Whose home by reason of neglect, cruelty or depravity of his parents or either of them, or on the part of his guardian, or on the part of the person in whose custody or care he may be, or for any other reason, is an unfit place for such child." Again, there was no finding that the home was an unfit place for the child. There was no showing that the mother neglected her, or was cruel to her, or that she acted in a depraved manner. The extent of the finding was that the mother was deeply disturbed, that is, mentally ill, although uncommitable. I do not think that the legislature intended this section to authorize the court to deprive a parent of the custody of his child simply because the parent is suffering from a mental illness, unless that illness causes him to mistreat or neglect the child or renders the home an unfit place, not merely an imperfect place, for the child.

The mental illness of a parent will, of course, affect the attitudes and emotional well-being of a child; so will a physical illness, or any number of anti-social attitudes which are not necessarily classified as mental illnesses. I do not think that the legislature meant to empower the

court to take charge of a child whenever its parent was not providing it with a perfectly healthy home atmosphere, for the perfect parent is the exception and not the rule.

It is, of course, unfortunate that a child should be subjected to the influence of its parent's delusions or prejudices or hostilities; but this is one of the hazards of family membership. I do not find in the statute an expression of legislative intent that parents who are devoted to their children should be deprived of their custody because of defects in their own personalities unless those defects have a seriously adverse effect upon the child. As I observed at the beginning of this opinion, it is significant in this case that, although the juvenile court had the child under surveillance from the time she was 8 years old, it did not decide to take her custody away from the mother until she was 13 years of age; and in the meantime, there was not manifested any great change in the personality of either the mother or the child. If it was safe to leave the child in the custody of her mother when she was 8 years of age, it was just as safe to leave her there when she was 13.

I think that if the legislature intended that a parent should be deprived of custody in a case such as this, it should have expressed that intent with greater clarity. I do not find that intent expressed in subsection (3) of the act.

The last subsection relied upon in support of the order, (9), pertains to habitual truancy. There was no allegation or proof of such truancy. The child's absences from school were explained and the court did not find that she was a truant.

However desirable it may be that a child should not be subjected to the influence of a mentally disturbed parent, the legislature has not provided that such a parent may be deprived of the custody of his child, where the illness has not caused him to neglect or mistreat the child, as is the case here.

I cannot escape the conclusion that the trial court exceeded its statutory authority when it ordered the custody of the child to be taken from the mother on the ground that

she was a bad influence because of her mental illness. The problem of the child's teeth having been attended to, and there being no other grounds in the record for declaring her dependent, the order should be reversed and the custody of Deborah Todd returned to her mother.

September 30, 1966. Petition for rehearing denied.