Ralph E. Cory, J.
The petition alleges that the respondent mother failed both to provide proper medical treatment and to report the two-and-one-half-year-old child’s, injuries (subject of this petition) to the proper authorities when the above child was injured on or about April 11, 1974. The instant petition is dated April 18,1974. The child had, at that time been at Richmond Memorial Hospital, Staten Island, for about a week.
The respondent mother was arrested by the police. The original petitioner was the arresting detective who brought an *408 action for neglect of said child in accordance with the provisions of article 10 of the Family Court Act (§ 1012). The court directed that, until the Bureau of Child Welfare could be notified, the arresting officer be the petitioner upon the initial arraignment of the respondent mother before the court. The court directed the Bureau of Child Welfare to conduct an immediate investigation, and remanded the child to Richmond Memorial Hospital with a directive that the child was not to be released until further order of the court. The court also directed that the other child of the respondent mother, a four-year-old, be added to the petition.
The respondent mother Was paroled for a hearing on April 30. On this date, the Bureau of Child Welfare was ordered to be copetitioner together with the arresting officer. .
On April 30, respondent mother, through her attorney, denied the allegations and the matter was set down for a full fact-finding hearing on May 17, 1974. Since the child was medically dischargeable on this date, the court ordered that the child and his older brother be paroled to the maternal grandparents, with visitation rights granted to respondent. The Bureau of Child Welfare was ordered to make a full investigation and report and be prepared to testify on the adjourned date set for the hearing. At the request of the Corporation Counsel, a subpoena duces tecum was issued for the medical records of the hospitalized child from Richmond Memorial Hospital.
The facts, as reasonably developed from the testimony of the parties are as follows:
The respondent mother on April 11, 1974 left the children at about 6:00 in the evening with an 18-year-old babysitter who had not baby-sat for her previously but with whom she was acquainted. Around 11:30 p.m. or midnight, she received a call from the babysitter, at the tavern to which she had gone. The babysitter informed her that she was tired of babysitting and was going to leave for the same tavenTto look for her own boyfriend. The mother told her on the phone that she would send someone over from the tavern and not to leave until they got there. Respondent then had three of her friends from the tavern come to the home around midnight, where they were admitted by the babysitter who then left.
The respondent mother returned home herself sometime between 1:30 a.m. and 3:00 a.m. When she arrived home, she received a phone call from the tavern stating that she had left her wallet at the bar and that she would have to come over for it immediately and reclaim it in person. The mother then *409 phoned another friend of hers who picked her np and drove her back to the tavern where she retrieved her wallet and then returned home.
Upon this second return home, the respondent found the three friends, who had originally relieved the babysitter, gone, and her boyfriend in the house. She also discovered, according to her testimony, that the infant had been hurt although he was sleeping at the time.
The mother testified that she then fell asleep until 11:30 a.m. or 12:00 Noon. The mother testified that she and her boyfriend had several arguments, he was angry at her and threatened to leave her, which apparently she attempted to prevent. The boyfriend left the home at 9:00 a.m. or 10:00 a.m. and she knew he had left. He had slept on a couch and not with her in the bedroom.
The police were called around 3:00 p.m. by a friend of the mother and the infant was taken to Richmond Memorial Hospital by ambulance. According to the hospital records admitted into evidence, the testimony of the arresting officer and the Bureau of Child Welfare investigator assigned to the case, the child had a swelling upon upper part of the forehead, blood on his head, deep scratches and bruises on the nose and face, but no fractures.
The arresting officer and the Bureau of Child Welfare investigator in their testimony readily admitted that they could not tell who actually had injured the child or how the child had been hurt. There Was no evidence submitted that the child’s injuries were caused by a fall either in the crib or from the crib to the floor. There was no evidence that the respondent mother actually assaulted her child. Despite the numerous persons in the home during the evening as babysitters and friends, no parties or witnesses could identify or testify with certainty that any of these people actually injured the baby.
The question here is that, even though the respondent mother did not assault her own child, is she still guilty of neglect according to section 1012 of the Family Court Act?
Section 1012 (subd. [f], par. [i]) of the Family Court Act defines a neglected child as one less than 18 years of age ‘ ‘ whose physical, mental or emotional condition has been impaired or is in imminent danger of being impaired as a result of the failure of his parent or other person legally responsible for his care to execute a minimum, degree of care * * *.
“ (A) in supplying the child with * * * medical * * * care, though financially able to do so * * *
*410 “(B) in providing the child with proper supervision or uartMcmshvp by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof ’ ’. (Emphasis supplied.)
Although there is no credible evidence that the mother assaulted the child by a direct act of commission, there is ample evidence in the instant case that the respondent mother is guilty of acts of omission and hence neglect under the aforementioned portions of section 1012 of the Family Court Act.
Respondent failed to exercise a minimum degree of care by allowing such a varied assortment of babysitters in her home, none of whom were qualified to care for a two-and-one-half-year-old child. All, including the mother, were tavern habitues. According to the testimony adduced hereunder, the home of the mother was in effect an adjunct to the tavern itself, a shuttle stop for. shady characters and barflies. Grin mills or taverns are not noted for handing out diplomas for virtue. Judging from what went on between the tavern and this home in the wee small hours of the morning and the strange comings and goings of characters in and out of the house on the night in question, it is miraculous that the baby even survived.
There is the failure here to provide the child with proper supervision or guardianship and allowing a substantial risk to the child which is referred to in subdivision (f) of section 1012 of the Family Court Act. This was accomplished by her allowance of a motley array of babysitters in her home. The babysitters here would think nothing of smacking the baby when it cried as a solution to being bothered rather than ministrating lovingly or tenderly to a two-and-one-half-year-old’s needs. This the court feels is reasonably inferable from the facts here.
Persons intent on drinking sprees, looking for boyfriends or “nursing drinks” all night long instead of a “baby” in their care are hardly the winged angels of mercy who know how to take care of a small baby, who hover lovingly over his crib and minister tenderly to his needs.
Respondent’s attorney makes much of the fact that the occurrences of the evening in question are a way of life for young people. This is not an excuse but rather an exercise in empty rhetoric by an overzealous attorney on behalf of his client. The court is not impressed by this argument and has no sympathy for a mother who allowed her child to have such a traumatic experience. The respondent mother exhibited an irresponsibility that bordered on sheer madness, not to mention an appalling “lack of moral supervision ”. It is too late for her now to *411 shed crocodile tears for her baby by having her lawyer say if she is reunited with the child, it will not happen again. (Matter of Tesch, 66 Misc 2d 900; Matter of Edwards, 70 Misc 2d 858.)
A prima facie case of neglect has been established here. “ Proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent * * * shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent ” (Family Ct. Act, § 1046, subd. [a], par. [ii]; emphasis supplied).
A mother does not have to be an expert in the care and bringing up of children; she is not required to be a Dr. Spook; she does not have to be a professional nurse; nor is she required to be the neatest housekeeper in the world. The mother’s conduct may not have been perfect and she may have exhibited a flair for a semihippie life. (Matter of Deseree T., 64 Misc 2d 281.)
This is not the case where the mother is judged by the mores of the community today, the Bohemian atmosphere, the jungle life, the incredible lowering of moral standards. Through the dim and murk of this modern-day living, she is still required to be responsible, especially where her young children are concerned. That law has never been suspended and is not dependent upon the lowering or raising of moral standards or by abstract norms as to how people live in their own environment. Whether one lives in a plush palace or a sleezy rooming house, neglect of children or their abuse will not be tolerated by this court in any way, manner or form.
Failure to exercise a minimum degree of care resulting in improper supervision is the irresponsibility involved here — a baby injured in his crib with no plausible explanation as to how he was hurt. An infant is entitled to sleep peacefully in his crib without being assaulted and injured. He is entitled to the loving protection and care of his parent-mother or an adequate substitute thereof if the mother is absent. It would be a comic travesty of justice to consider any of the tavern habitues in this case as qualified babysitters.
This is the law and any violation of it is neglect, plain and simple. The Family Court has a heavy burden in regard to protecting children not only from an assaultive parent but also from an irresponsible parent. This court will never shirk its responsibility in that respect.
Accordingly, there is a finding of neglect of the respondent mother based on all of the foregoing under section 1012 (subd. *412 [f], par. [i], cls. [A], [B]) and section 1046 (subd. [a], par. [ii]) of the Family Court Act.
There is also a finding of neglect in that the mother did not act promptly when she first discovered the baby was injured at around 3:00 a.m. Some 12 hours later, a delay that could h.ave been fatal, she rushed the baby to a hospital, presumably, having suffered pangs of remorse.
This finding is based on a preponderance of the competent material and relevant evidence. (Family Ct. Act, § 1046, subd. [b].)
The -Probation Department is ordered to conduct immediately a predispositiónal hearing investigation.
Dispositional hearing June 18, 1974.
Probation Department is ordered to conduct a full B. M. H. S. on respondent mother.
Present parole of both children is continued to paternal grandparent.
Visitation rights continued as at present to respondent mother.