[No. 1615-2.    Division Two.    May 8, 1975.]

*In the Matter of the Welfare of* DAVID PRICE *et al.*

*J. D. Schumacher* and *Charette & Brown*, for appellant.

*Curtis Janhunen, Prosecuting Attorney,* and *Dennis R. Colwell, Deputy,* for respondent.

PEARSON, J.—Petitioners, Clarence and Emma Lou Price, seek review by certiorari of an order of the Grays Harbor Superior Court permanently depriving them of parental

custody of their minor children, David, Martha, and Joyce Price, upon a finding that the children are dependent as defined in RCW 13.04.010(2), (3), and (12).[1]

The petitioners challenge the sufficiency of the evidence to support several material findings of fact including those to the following effect: (1) that the parents failed to afford the two older children, aged five and three, medication and x-ray examinations required by their tuberculosis; (2) that they failed to feed, dress, or supervise the children properly; (3) that they maintained a "filthy" home; (4) that they declined or ignored repeated offers of assistance from various public agencies and were unable to understand that their home environment was unsuitable for the children; (5) that the children "were well on their way towards dying"; (6) that the children showed substantial physical improvement after being placed in a foster home; and (7) that permanent deprivation was the only viable alternative to insure the future welfare of the children. Petitioners also challenge the court's appointment of an attorney to represent the children, rather than a guardian ad litem. After a careful consideration of the record, we affirm the order of deprivation.

---

[1]RCW 13.04.010 provides, in pertinent part, as follows:

"For the purpose of this chapter the words 'dependent child' shall mean any child under the age of eighteen years:

". . .

"(2) Who has no parent, guardian or other responsible person; or who has no parent or guardian willing to exercise, or capable of exercising, proper parental control; or

"(3) Whose home by reason of neglect, cruelty or depravity of his parents or either of them, or on the part of his guardian, or on the part of the person in whose custody or care he may be, or for any other reason, is an unfit place for such child; or

". . .

"(12) Who is grossly and wilfully neglected as to medical care necessary for his well-being.

". . .

"For the purpose of this chapter only, all children who have been adjudicated delinquent and dependent children within the state shall be considered wards of this state and their persons shall be subject to the custody, care, guardianship and control of the court as hereinafter provided."

■ While it is true that a parent's interest in the custody and control of minor children is so worthy of deference as to have been characterized as "sacred," *In re Hudson*, 13 Wn.2d 673, 678, 126 P.2d 765 (1942), it is also true that the dominant concern on review should be the welfare of the child. *In re Sego*, 82 Wn.2d 736, 513 P.2d 831 (1973); *Todd v. Superior Court*, 68 Wn.2d 587, 414 P.2d 605 (1966).

■ The standards and quantum of proof to be applied in reviewing an order of permanent deprivation are found in *In re Sego, supra*. As in other cases on appeal, we may not weigh the evidence or evaluate the credibility of witnesses. For an order of permanent deprivation to be sustained, however, the findings of fact must be supported by substantial evidence. In a deprivation proceeding, "substantial evidence" means clear, cogent and convincing evidence, showing the necessity for permanent deprivation to be "highly probable."

■ Our review of the record convinces us that it is highly probable that the health of the three minors has been significantly jeopardized by the neglect of the parents. We summarize the testimony as follows.

(1) After primary tuberculosis was diagnosed in the two older children, the parents neglected to administer the necessary medication with the prescribed frequency or to obtain X rays at the required intervals. The serious consequences of such omissions could have spread the disease to their infant sister.

(2) All the children exhibited other signs of poor health. Joyce was clearly malnourished, and the others had "ravenous" appetites and gained weight substantially after being removed to a foster home in February 1974. David had ringworm. Both he and Martha had decayed teeth. The parents resisted attempts by the public health staff to see that medication and X rays were given regularly. Appointments for X rays and homemaker assistance were ignored. The efforts of the Children's Protective Service worker to improve conditions for the children were met with hostility.

(3) There was additional, compelling evidence of child neglect. The older two children were allowed to play outside with inadequate clothing in inclement weather. After the family furnace ceased working, the home was heated by means of the electric range and oven being turned on for hours, a dangerous situation in the vicinity of small children. The children were seldom fed more than one full meal a day, sometimes supplemented by meals served by neighbors. Their clothing was chronically dirty. The home was filthy, even to the extent of containing, on occasion, animal and human excrement.

As a result of these factors, at the time they were taken to the foster home the children were dull and inactive to the point of malaise. Their foster mother, Mrs. Bergen, testified that the children emerged from their lethargic state and became normally active and alert after a few weeks of regular medication, a balanced diet, and a program of personal hygiene.

An example of both the condition of one of the children and the attitude of Mr. Price toward rehabilitation is contained in the testimony of Stephen Myers, a Children's Protective Service worker for the Department of Social and Health Services in Aberdeen. In describing a visit to the home of petitioners at 11:30 a.m. on January 25, 1974, Myers testified:

Q. What was your impression of the home at that time?
A. Well, the thing that sticks in my mind the most was Martha. This was about 11:30 in the morning when we arrived there and she was lying in a fetal position in an overstuffed chair. Her hands were clasped on her stomach and her eyes were open and she was just staring. I tried to get a response from her. I tweaked her nose and wiggled on her ears, pulled on her ears a little bit, and just nothing, no response at all, not even an acknowledgment that I was there. And, I finally picked her up and tried to bounce her around but she wouldn't respond to that either, and so I finally put her back down in the chair, and Mr. Price told me—I mentioned, you know, that she looked pretty bad and wasn't responding to anything, and he says, "Oh, she just does that from time to

time and you just can't get her out of it." Mr. Vreeland [juvenile probation officer] and I talked to him about the fact that we had received the complaint that there was no food and asked him if we could verify that by going into the kitchen and looking in the cupboards and the refrigerator, and it was at that point that he became quite angry, said that he had been bothered enough, there was nothing wrong with his kids, they were taking good care of them, he didn't want us to come around any more, and he wasn't going to let us on into the kitchen.

. . .

Q. What were the other children like at this time?

A. Well, Mr. Price was sitting on the davenport across sort of kitty-corner from the chair that Martha was on . . . he was being fairly hostile. He wasn't being very cooperative and didn't want us messing around in the house. David was underneath a pile of blankets on the bed and Joyce we could hear around the corner but I couldn't see her from where I was standing. And we just, you know—really he was being quite hostile to the point, . . . that he was talking about getting a gun and if anybody bothered his kids any more he was going to come after them, this type of thing.

This visit occurred within a month of the time the children were made wards of the court and placed under foster care. It illustrates a callous unwillingness to cooperate with the authorities, who for many months had been attempting to work with the parents in solving the health and dietary problems of the three children.

There is no evidence of parental brutality in this case, nor do we believe the Prices' pattern of neglect stems from malice. However, they are parents who—from a combination of low intellect,[2] stubborn distrust of dedicated public employees, bad judgment, and poverty—have shown themselves unable to provide the attention and medical care necessary to the well-being of their children. Although we are particularly reluctant to approve such a step in the absence of physical brutality, we are persuaded the evi-

---

[2]Mrs. Price was unable to exceed a third-grade reading level in school and at the age of 11 tested out at the bottom 3 percent on the Wexler intelligence scale. Mr. Price testified he is illiterate.

dence supports the order of permanent deprivation under the test in *In re Sego, supra.*

The trial court found, in its finding of fact No. 11, "[t]hat the Price children were well on their way towards dying at the time they were removed from their parents' custody." The requisite medical testimony to support this finding does not appear in the record and the statement appears to somewhat exaggerate the situation, particularly with regard to David and Joyce. However, Dr. Bigler, the pediatrician, did indicate that a child Joyce's age could die upon contracting tuberculosis. She further testified that the possible effects upon David and Martha of irregular ingestion of medication could be double pneumonia, meningitis, or permanent pulmonary disease. It is obvious that tuberculosis can lead to serious, perhaps fatal, consequences. It is not necessary that we find full support for finding of fact No. 11 in order to affirm the deprivation in view of evidence supporting the other findings, and there is strong evidence the children's health was seriously endangered in their home environment.

We next consider the appointment of an attorney, John Lindel, to represent the children in the deprivation proceedings.[3] No guardian ad litem per se was appointed in addition. Petitioners contend that a proper guardian ad litem should have been appointed and that Mr. Lindel abused his role by acting primarily as an additional prosecutor of the parents.

It is not unusual for a guardian ad litem to be an attorney, but the order did not appear to designate Mr. Lindel a guardian. The applicable statute, RCW 13.04.070, does not specify that a guardian ad litem must be appointed in a deprivation proceeding, but simply that "some suitable person or association to act in behalf of the child" must be appointed. This section has been interpreted to *require* the

---

[3]The order provides that "John T. Lindel, a duly licensed and practicing attorney, is appointed to represent the above-named children, at public expense."

appointment of a guardian only in the absence of the parents or probation counselor at the dependency hearing. *In re Jones*, 41 Wn.2d 764, 252 P.2d 284 (1953). In the case before us, not only were the parents present at the hearing, but also Mr. Bruce Vreeland, a probation officer who had investigated conditions at the Price home. The trial court has discretion to appoint a guardian ad litem to protect the children's rights when they might conflict with the interests and desires of the parents, as in the instant case. *In re Lewis*, 51 Wn.2d 193, 316 P.2d 907 (1957). The discretion exists even when the parents object to the appointment of a guardian. *In re Dunagan*, 74 Wn.2d 807, 447 P.2d 87 (1968).

We believe the trial court properly exercised its discretion in appointing Mr. Lindel as a "suitable person" to represent the Price children. The court was not required to appoint a guardian per se to safeguard the children's interests.[4] Mr. Lindel did represent them vigorously; indeed it is claimed he acted *too* vigorously in representing them to the extent of prosecuting the parents. The record reveals that his role at trial seems to have entailed a ferreting out of the complete details of the Prices' home environment. We do not find this improper in view of his obligation to fully represent the children's best interest.[5]

The order of permanent deprivation is affirmed.

PETRIE, A.C.J., and ANDERSEN, J., concur.

Petition for rehearing denied July 2, 1975.

Review denied by Supreme Court November 5, 1975.

[4]*See Kennedy v. Department of Pensions & Security*, 277 Ala. 5, 166 So. 2d 736 (1964); *Johnson v. Lambotte*, 147 Colo. 203, 363 P.2d 165 (1961); *Smith v. Langford*, 255 So. 2d 294 (Fla. Dist. Ct. App. 1971); *Gann v. Burton*, 511 S.W.2d 244 (Tenn. 1974).

[5]Of course, there would be circumstances in which a lawyer could not act properly in a dual role of guardian or strictly in lieu of a guardian, such as where a minor is a criminal defendant. *See* RCW 4.08.050; *In re Dobson*, 125 Vt. 165, 212 A.2d 620 (1965).