650 P.2d 467

**In the Matter of the APPEAL IN COCHISE COUNTY JUVENILE ACTION NO. 5666–J.**

**No. 2 CA–CIV 4165.**

Court of Appeals of Arizona,
Division 2.

Dec. 23, 1981.

Robert K. Corbin, Atty. Gen., by Jay W. McEwen, Asst. Atty. Gen., Tucson, for appellant Arizona Dept. of Economic Security.

Greenwood, Ryan, Herbolich & Atonna, Ltd. by James B. Greenwood and Wallace R. Hoggatt, Bisbee, for appellees juveniles and their parents.

HOWARD, Judge.

The state has brought this appeal to challenge the juvenile court's dismissal of its petition for adjudication of dependency in this action. We reverse and remand for proceedings in accordance with this opinion.

On March 20, 1981, appellee mother took her six-year-old son to the emergency room of the Copper Queen Community Hospital in Bisbee, Arizona. He was not breathing, and was pronounced "dead on arrival" after efforts to restore life functions failed. The emergency room physician, Dr. McCleave, noted the following abnormal conditions of the boy on his initial assessment: (1) His pupils were fixed and dilated, and the corneas of his eyes were clouded over. This would indicate that the oxygen supply to the brain had been stopped long enough to cause brain damage and the eyes had been open and unblinking for a period of time. (2) His lips were chapped, and his skin was dry and cracked. This suggested that dehydration had been going on for some time. (3) There was foul-smelling fecal matter in the boy's mouth which is indicative of prolonged or severe vomiting. (4) The most remarkable irregularity, however, was the boy's abdomen which the doctor described as being the size of a basketball.

The medical examiner, Dr. Froede, determined in a autopsy that the cause of death was "septicemia and peritonitis secondary to perforation of a strangulated inguinal hernia." This occurs when part of the intestine pokes out through a defect in the abdominal wall and gets caught. Intestinal obstruction may then occur which will cause a decrease in blood supply to the area, tissue death, and eventually rupture of the bowel. Digestive material then pollutes the abdominal cavity causing infection which eventually invades the bloodstream and the whole abdominal area. This condition leads to cardiac arrest and death.

In the very early stages of this process, the hernia may be "reduced" or pushed back into the abdominal cavity without surgery. If surgery is required, it is initially fairly safe and simple unless performed late in the progression of symptomatology.

The various symptoms which would become manifested during this progression would include acute pain, steady dehydration, fever, persistent vomiting, unusual abdominal swelling and finally shock, coma, and death. Both doctors stated that estimating the actual duration of the boy's illness was very difficult, but the malady could have lasted weeks depending on the nature of the intestinal obstruction. The boy never attended school after March 3, 1981.

Because of the circumstances surrounding the boy's death, Dr. McCleave notified the Arizona Department of Economic Security concerning the case, and two DES caseworkers visited appellee-parents' home in Miracle Valley on March 31, 1981. At that time the mother told the caseworkers that she had not obtained medical help for her deceased son, would not seek medical help for any of her other children, and would not allow anyone else to take the children to a doctor because she believed miracles would adequately safeguard her children.

DES thereafter filed a petition in the Superior Court of Cochise County to have appellees' seven children adjudged dependent children. This petition did not seek to remove the children from their parents' custody. It sought only to insure that proper medical care would be provided for the surviving children.

A hearing on this petition was held on July 23, 1981, to determine if the children were, in fact, "dependent children" as defined in A.R.S. § 8–201(10). At the close of the state's case, a motion to dismiss was granted following findings of fact that the children were well fed, well clothed, attended school with regularity and had a home which was clean and well kept. While this may be true, we disagree with the court that there was insufficient evidence in this case for a finding of dependency under Arizona statutes.

As we read the statutes, every child in Arizona is entitled to a home where the parent or guardian is willing to seek medical attention for him should he become sick or injured. When the mother in this case states that she will not seek medical attention for her children should they become ill, she is saying that she is unwilling to exercise reasonable care as required by A.R.S. § 8–201(2) and (10), and the state has a right to intervene.

According to A.R.S. § 8–201(10) a dependent child means a child who is adjudicated to be:

"(a) In need of proper and effective parental care and control and has no parent or guardian, *or* one who has *no parent or guardian willing to exercise* or capable of exercising such *care* and control.

(b) Destitute or *who is not provided with the necessities of life,* or who is not provided with a home or suitable place or abode, or whose home is unfit for him by reason of *abuse, neglect,* cruelty, or depravity by either of his parents, his guardian, or other person having his custody or care." (Emphasis added)

Child abuse is defined in A.R.S. § 8–201(2) as:

". . . the infliction of physical or mental injury or the causing of deterioration of a child and shall include *failing to maintain reasonable care and treatment* or exploiting or overworking a child to such an extent that his *health, morals or emotional well-being is endangered.*" (Emphasis added)

A fair reading of these statutes would be that they are intended to insure that children are properly cared for by their parents. This care encompasses a parental duty to provide children with the necessities of life, including medical attention. *State v. Williams,* 4 Wash.App. 908, 484 P.2d 1167 (1971); *Matthews v. State,* 240 Miss. 189, 126 So.2d 245 (1961); 67A C.J.S. Parent & Child § 70 (1978). Indeed, the Supreme Court has recently stated that among parental obligations in regard to their children is "a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Parham v. J. R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). The Court noted that a state is not without constitutional control over parental discretion in dealing with children when their

physical or mental health is jeopardized. *Parham v. J. R.,* supra. See also *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

It is important that the passive conduct involved here not be confused with the absence of abuse. In this case, not doing something (failing to maintain reasonable care by not providing medical attention) is abuse. The standard used is "at what time would an ordinarily prudent person, solicitous for the welfare of his child and anxious to promote it recovery, deem it necessary to call in the services of a physician." *State v. Williams,* supra; *People v. Edwards,* 42 Misc.2d 930, 249 N.Y.S.2d 325 (1964). According to the past acts and statements of the mother, we know that that time will never come for her children, and therefore we know that should they become injured or ill and in need of medical services, they will be abused.

The problem involved here seems to be the fact that medical attention, unlike other necessities such as food and shelter, is needed only on a sporadic basis. Certainly if a parent would state that she intends to withhold food or shelter from her children, and it is demonstrated that the parent had done so in the past with a death occurring, the state would have a right to intervene.

Indeed, when a child is in need of continuous medical attention and the parents have failed to provide medication or to follow prescribed treatments, the courts have intervened. A court permanently removed three children from a home in *In re Welfare of Price,* 13 Wash.App. 437, 535 P.2d 475 (1975) without any signs of brutality for failure to provide medication and attention to two children who had primary tuberculosis. The third child had no disease process. *In People in the Interest of D. K.,* 245 N.W.2d 644 (S.D.1976) a court removed a child with a congenital defect from a home based on the fact that he was without the care necessary to his health and welfare, that his mother failed to provide for his special medical needs, and that his mother did not feed him the diet prescribed by his doctor. This, according to the court, consti-

tuted lack of proper parental care absent any finding of abuse. See also *Custody of a Minor,* 375 Mass. 733, 379 N.E.2d 1053 (1978), where a court ordered that a child with leukemia should receive chemotherapy treatments overriding a mother's desire to rely on diet manipulation and prayer.

Appellees argue that the state has not proven that any of the children are in a life-threatening situation concerning their health, and therefore the state may not intervene. First we note that none of the children have been examined to find out what the state of their health may be. Second, it is unclear that children who may at any time become sick or injured without any provision for medical assistance are not in jeopardy health-wise. And third, assuming arguendo that their lives are not immediately in danger, it seems clear that it is unwise to allow intervention only after a child has been seriously injured as a result of inadequate living conditions or supervision. The statutes speak in terms of "reasonable care" of "health" and "emotional well-being" not emergency situations or life and death situations only. *In Matter of Gregory S.,* 85 Misc.2d 846, 380 N.Y.S.2d 620 (1976), a school doctor found the oldest of three children to be suffering from a hernia, cavities, and "fractured teeth". The mother refused to permit medical or dental care of the child or to permit medical or dental examination of the other children on grounds of religious beliefs. The court found that the mother's refusal constituted neglect and ordered medical and dental examinations of each child with further action to be taken by the court upon receipt of examinations. We do not find that order or a similar one in this case to be beyond the court's authority.

Other cases affirm this principle that courts have power to order medical treatment over parental objections even when a child's life is not immediately endangered. Failure to obtain psychological help for a child as recommended by a guidance counselor, social worker and psychiatrist was found to constitute neglect. *Matter of Ray,* 95 Misc.2d 1026, 408 N.Y.S.2d 737 (1978).

See also *In re Carstairs*, 115 N.Y.S.2d 314 (Dom.Rel.Ct.1952). Three children who had voluntarily been made dependents of the state had tonsils and adenoids removed despite their father's religious objections in *In re Karwath*, 199 N.W.2d 147 (Iowa 1972). There was no showing of a life-threatening situation. In a special affirmance of a lower family court's decision, the New York Court of Appeals held that it was not necessary that there be a threat to the "physical health or life of the subject or to the public in order for courts to intervene." In so doing it ordered surgery to correct a massive disfigurement of a child which posed no medical emergency or threat. *In re Sampson*, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972). See also *In re Rotkowitz*, 175 Misc. 948, 25 N.Y.S.2d 624 (1941) where a court ordered surgery to correct a foot deformity induced by poliomyelitis. The court noted that it had "the power to require that children be examined psychiatrically, tested psychologically and physically examined so that the Court may be aided in determining what is best for the child." In this case the operation was considered necessary to prevent further deformity and immobility and for correction of the condition.

Appellees also argue that the treatment or nontreatment of the deceased child should have no bearing on the state's dependency proceeding involving appellees' other children who have not been shown to have been abused. We disagree.

In the case before us, the mother has stated that she did not seek any medical attention for her deceased son and there is testimony that his condition was such that had attention been sought for his hernia problem, he would have survived—perhaps even without surgery or medication. The mother states that she will not seek medical care in the future. Because of her prior actions, we can believe this statement.

The better-reasoned approach in this situation would seem to be that parents cannot have the privilege of inflicting abuse upon each of their successive children before the children can be protected by the state. *In*

*the Matter of T. Y. K.*, 598 P.2d 593 (Mont. 1979). In such child protective proceedings, it is the function of the court to determine not only whether neglect or far more serious abuse exists, but whether it is likely to exist in the future. A court sitting as parens patriae cannot be limited to existing or past conditions. *In re Maria Anthony*, 81 Misc.2d 342, 366 N.Y.S.2d 333 (1975); *In re Baby Boy Santos*, 71 Misc.2d 789, 336 N.Y. S.2d 817 (1972); *In re J.*, 71 Misc.2d 47, 335 N.Y.S.2d 815 (1972). This does not only apply to physical abuse cases. A mother was found guilty of neglect when she delayed twelve hours before taking a child with a head injury to a hospital. Because of this, and the use of unqualified babysitters, the court in *In re M.*, 78 Misc.2d 407, 357 N.Y.S.2d 354 (1974), paroled the injured child and a four-year-old brother to the care of the maternal grandparents with visitation rights. In an older case, a father refused to obtain medical assistance for his wife and three children who died of illnesses within less than seven months prior to the hearing. The state removed the two surviving children from the home upon testimony of the father that "should they become ill and he have opportunity, he would be as likely to apply the treatment ["Bannscheidt" system] to them as he was to those which are dead, and as unlikely to call any physician, of any school, qualified for his business. His own testimony shows no change in his mind as to the medical treatment of his family." *Heinemann's Appeal*, 96 Pa. 112, 42 Am.Rep. 532 (1880). See also *In re Welfare of Price*, supra, and in *Matter of Gregory S.*, supra. It is unknown at this time if the surviving children have any chronic disease such as tuberculosis or any congenital defects or even if any of them have hernias, as did their brother, which could also become strangulated. It does not seem unreasonable for the state to intervene presently to prevent possible disaster in the future.

Lastly, it is appellees' contention that their beliefs concerning medical care and healing by miracles are constitutionally protected from state intervention. While it is unclear from the record exactly what appel-

lees' religious beliefs are, it is clear that the free exercise clause does not guarantee parents complete control, free of all state authority, merely because the parent asserts that his control is based on religion. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), sets out the often quoted definitive statement of law in this area:

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. [citations omitted] And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control.... Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.... *The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death....*

\*    \*    \*    \*    \*    \*

... Parents may be free to become martyrs themselves. But it does not follow that they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." (Emphasis added)

It must also be noted that the particular religious belief of a person provides no defense in prosecution for breach of a duty imposed by statute to furnish necessary medical attention to a child. Such statutes make it the duty of those charged with the care of a child to furnish medical attendance to the child, regardless of their religious belief, as the statutes are directed to the acts and not the beliefs of the individuals. Annot. 12 A.L.R.2d 1047 at 1050 (1950). *People v. Arnold,* 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967); *State v. Perricone,* 37 N.J. 463, 181 A.2d 751 (1962), cert. den. 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124.

Many of the cases where states have intervened over the religious objections of parents involve blood transfusions. See *Harley v. Oliver,* 404 F.Supp. 450 (D.C.Ark. 1975); *Jehovah's Witnesses In the State of Washington v. King County Hospital,* 278 F.Supp. 488 (D.C.Wash.1967), aff'd. 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *Muhlenberg Hospital v. Patterson,* 128 N.J. Super. 498, 320 A.2d 518 (1974); *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 104 N.E.2d 769 (1952). There are others, however, which involve less immediately threatening situations. A Texas appellate court allowed the state to intervene when it was determined that a child with possible rheumatoid arthritis needed diagnostic tests, medical observation and possibly medical treatment. This was over the mother's objection due to her faith in divine healing and in the power of religion to overcome all physical ailments and disease. *Mitchell v. Davis,* 205 S.W.2d 812 (Tex.App.1947). See also *In re Karwath,* supra; *In re Sampson,* supra; 52 A.L.R.3d 1118 (1978).

We reverse and remand this case for proceedings in accordance with this opinion.

BIRDSALL, J., concurs.

HATHAWAY, Chief Justice, dissenting.

The facts of this case conjure up a terribly unfortunate scenario and I, along with my colleagues, am loathe to allow it to recur. However, unlike my colleagues, I am convinced that there exists no statutory or case law allowing the state to proceed with its proposed remedy of the situation, i.e., declaring the remaining children dependent for the purpose of providing medical care. What the majority opinion has accomplished is to create a status for children heretofore unknown in Arizona—"anticipatorily dependent" children. The danger of such a creation is staggering in its possible misuse. In the absence of legislative authority for its creation, it should not be allowed to take root in this state's body of juvenile law.

The very language of A.R.S. § 8–201(10), cited by the majority, excludes from its coverage the children involved herein. The children are not "[i]n need of proper and effective parental care and control" pres-

ently and subsection (a) certainly is referring to a current need. Subsection (b) refers to children who are not provided with the necessities of life and children who are abused or neglected. I agree with the majority that the statutes are intended to insure that children are properly cared for by their parents and that this care includes medical attention. However, the authority cited by the majority is two criminal cases where the *presently* existing neglect of children is alleged to maintain a case for criminal penalties and a United States Supreme Court case, *Parham v. J.R.,* supra, which has as its narrow focus the question of whether a child who has demonstrated a *current* need for mental health care is due some constitutional safeguards where his parents or guardian seek state-administered institutional mental health care for him. That case also can support my position since its focus is the states' power to control parental discretion in dealing with children when their physical or mental health is being jeopardized. The children involved herein are not presently faced with their physical or mental health being jeopardized. The citation to Corpus Juris Secundum is again only support for the proposition that where a current medical need of a child has arisen, the courts are empowered to intervene. With that I have no disagreement.

The majority's opinion secondarily attempts to label these children dependent under the abuse definition of A.R.S. § 8–201(2), which is allowed under A.R.S. § 8–201(10)(a). Again I would stress that the statute is addressing current situations when it defines "abuse" as "the infliction of physical or mental injury or the causing of deterioration of a child." The majority emphasizes "failing to maintain reasonable care and treatment" and the fact that the child's "health, morals or emotional well-being is endangered." A.R.S. § 8–201(2). I would emphasize "failing" and say the parents herein have not failed in relation to the children before us, and "is" and say that that connotes a present-day status that has not been shown to exist herein.

I have searched for authority for the proposition that the state has the right to

declare children dependent before a present danger exists to their well-being and have found but one, *Heinemann's Appeal,* supra, cited by the majority. The majority has cited over twenty cases to bolster its position, but I believe my colleagues would not challenge the fact that that one case is the only one on point with this one presently facing us. The others either involve criminal prosecutions for alleged on-going abuse or neglect and abuse or neglect that has already occurred, see, e.g., *People v. Edwards,* supra; *In re M.,* supra; *People v. Arnold,* supra; *State v. Williams,* supra; *Matthews v. State,* supra; cases involving the presently existing need for medical attention in civil proceedings, see, e.g., *In re Rotkowitz,* supra; *Mitchell v. Davis,* supra; *State v. Perricone,* supra; *In re Karwath,* supra; *Matter of Ray,* supra; *In the Matter of Gregory S.,* supra; *In re Sampson,* supra; *In the Matter of T.Y.K.,* supra; *In re Welfare of Price,* supra; *In re Carstairs,* supra; *People in the Interest of D.K.,* supra; cases where children are removed from their homes because their parents are deemed likely to physically abuse them based on their prior abuse of other children in the home, see, e.g., *In re Baby Boy Santos,* supra; *In re J.,* supra; or cases where the parent is deemed unfit, due to a mental illness, to properly care for a child, see, e.g., *In re Maria Anthony,* supra. The majority cites *In re Welfare of Price,* supra, and makes it appear similar to our situation, stating that the court removed a third child from a home, even though she had no disease, after evidence showed that two other children with tuberculosis were not provided medication and attention to their medical needs. That case is at the other end of the spectrum from the instant one. The court there noted that the evidence supported the findings that the children were constantly in dirty clothing, that the parents failed to feed or supervise them adequately, and that the home was filthy, "even to the extent of containing, on occasion, animal and human excrement." 535 P.2d at 477. Indeed, the court found that the third child herself was clearly malnourished.

In short, the majority's attempt to bolster its gut reaction to the instant situation has not met with a plethora of authority. As to the authority of *Heinemann's Appeal,* I can only express my hope that a 101-year-old lower court case out of New York will not be the sole support for my colleagues' creation of the category, "anticipatorily dependent" children.

By that term I refer to the now real possibility of the state's filing dependency petitions in any parent-child situation where it will attempt to prove that an act of dependency will[1] occur in the future. The majority states, without benefit of authority, "Certainly if a parent would state that she intends to withhold food or shelter from her children, and it is demonstrated that the parent has done so in the past with a death occurring, the state would have a right to intervene." I disagree. If a parent on January 1, 1982, states: "I am going to deny my child, X, food beginning January 1, 1983," the majority would maintain that the state can have that child declared dependent as of January 1, 1982. Such a result follows under the new doctrine of "anticipatorily dependent" children and is absurd. Under our statutes, that child is subject to being declared dependent on January 1, 1983, if food is being withheld. The evidence before the trial court was that, aside from the mother's quarrel with traditional notions of medical care, the home environment would in no way support a finding of dependency. The instant case is even more absurd than my above hypothetical since in the hypothetical a definite date of January 1, 1983, is given for when the dependency status under the statutes will begin; in the instant case, on the other hand, the remaining children may never have need for traditional methods of medical care. We are all aware of persons, now elderly, who have managed to get through their lifetimes without (some would argue because of a lack of) traditional medical care. Here, when the children reach the age of majority, they will be able to choose what avenue they might like to follow for their physical well-being. Where no present need now exists for declaring these children dependent, why is the state intervening? Would the state obtain a list of Jehovah's Witnesses (who, because of religious beliefs, would deny their children a blood transfusion indisputably necessary to save the child's life) and file dependency actions as to those "anticipatorily dependent" children prior to the need for the transfusion—indeed, in no anticipation that such transfusions may ever be needed? Under the majority opinion, such a result would be possible and cannot possibly be supported under the current state of our statutory and case law.

I would affirm.

---

1. I take it as given, as does the majority, that these parents, presented with an identical situation involving a surviving child, would again deny that child traditional medical care.