527 So.2d 230 (1988)
In the Interest of K.H., a Child, Appellant,
v.
State of Florida, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 87-1509.
District Court of Appeal of Florida, First District.
May 18, 1988.
*231 David C. Braun, Lake City, for appellant.
Robert A. Butterworth, Atty. Gen. and Eric J. Taylor, Asst. Atty. Gen., Tallahassee, for appellee.
ERVIN, Judge.
This is an appeal from an order permanently committing a dependent child to the Department of Health and Rehabilitative Services (HRS) for subsequent adoption. We reverse.
As recited in the lower court's order of permanent commitment, K.H. had been in foster care for twenty-six months of his thirty-four-month-old life, having first been placed in the custody of HRS on September 9, 1985, based upon a subsequent determination of dependency, effected by the mother's physical neglect and inability to care for the child. K.H. remained in foster care until June 2, 1986, when the court ordered him returned to his mother's custody under the protective supervision of HRS. On July 1, 1986, K.H. was removed a second time by HRS, as a result of the child's medical condition, revealing severe diaper rash, possible infection of the diaper area and impetigo. No dependency order issued, however, as the child was, following the court's denial of HRS's petition for change of placement, once again returned to the care of his natural mother.
While the child remained in his mother's care, the mother was arrested on a charge of criminal child abuse on July 30, 1986, based upon the earlier incident of July 1, 1986. Although the mother was released on bail the same day of her arrest, at approximately seven o'clock, p.m., she failed to contact the baby sitter, with whom the child had been placed, until 11:30 a.m. the following day.[1] Shortly after her contact, HRS took the child from the baby sitter, presumably due to the mother's "abandonment" of the child by not promptly notifying the baby sitter of the mother's delay. HRS thereafter filed a detention petition, alleging both the mother's abandonment of the child and her parental and medical neglect, detailing specifically the 106 insect bites found on K.H.'s body on July 31, as well as the child's fever, sore throat, and an ear infection. K.H.'s medical condition was the critical fact that ultimately *232 resulted in the order of permanent commitment.
Initially, we find no merit in the first point raised by the appellant mother, urging that the lower court erred in denying her motion to disqualify the court on the ground of prejudice. Essentially all that appellant alleged in her affidavit attached to the motion was that the trial court was prejudiced against her because he had conducted numerous proceedings involving appellant and had issued orders finding the child dependent, as well as directing that permanent commitment proceedings be initiated. The rule is well-established that adverse judicial rulings do not constitute sufficient grounds to disqualify a judge. See Wilson v. Renfroe, 91 So.2d 857, 860 (Fla. 1956); Payton Health Care Facilities, Inc. v. Estate of Campbell, 497 So.2d 1233, 1238 (Fla. 2d DCA 1986), rev. den., 500 So.2d 545 (Fla. 1986). Cf. Jenkins v. C.A.J., 434 So.2d 9 (Fla. 1st DCA 1983) (no predisposition by the trial court disclosed in the record favoring permanent commitment prior to the hearing).
We agree with appellant, however, that the lower court's order permanently committing the child on the ground of neglect lacked a legally sufficient evidentiary predicate. The state has in fact confessed error in this regard. Section 39.01(27), Florida Statutes (1985), defines neglect in part as occurring
when the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person primarily responsible for the child's welfare deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment or permits a child to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.
A parent is, however, excused from a finding of neglect if the child's condition is "caused primarily by financial inability unless services for relief have been offered and rejected." Id. Although the statute does not define the term "significant impairment," it is obvious from a plain meaning of the words that a parent cannot be guilty of neglect if the impairment to the child's physical health is only insignificant. "Significant" is defined in part as being "important or momentous." Webster's New World Dictionary 1325 (2d College Ed. 1980). Only the court's finding relating to the existence of 106 insect bites on the child's body could conceivably be described as falling into the classification of important or momentous impairment.
The essential findings of the trial court, leading to the determination that the child should be permanently committed on the grounds of the mother's neglect and her failure to comply with the terms of the performance agreement, were set forth in the following specific language:
[O]n August 1, 1986, the child was removed for a third time from the mother by reason of medical neglect and lack of care. The child had an ear infection, throat infection and was covered with 106 insect bites. The mother has had the opportunity to complete Performance Agreements and she has failed to substantially comply with Performance Agreements, in that she has failed to maintain stable housing, has failed to attend counseling appointments, and has shown a lack of concern and care for her child during the entire time that the child has been placed in foster care except immediately prior to a Judicial Review. The record is replete with evidence of the mother placing her own needs and gratifications above the needs of, and to the detriment of, the minor child.
Notwithstanding the child's medical condition, the statute defining neglect requires that the court must find the parent responsible for or cause the condition. Proof of such a determination in a permanent commitment setting is required by clear and convincing evidence, see Section 39.41(1)(f)3.a., Florida Statutes, as opposed to the preponderance of evidence standard demanded for determining a child dependent. See Section 39.408(2)(b), Florida Statutes. The causal foundation for the child's condition in the present case has not been established *233 by clear and convincing evidence. When K.H. was last returned to the custody of HRS on July 31, 1986, he had been removed from the care of his baby sitter, a person previously approved by HRS, and there is no showing in the record whether the bites occurred while the child was in the baby sitter's or the mother's care.
Although it is true that there is testimony in the record by a caseworker who had earlier visited the mother's home revealing that the place was, in the caseworker's words, infested with yellow flies, there is also testimony by the same caseworker that the mother was trying to keep the child inside the house, rather than allowing him to play in the yard because of the presence of the flies. Moreover, even assuming that the evidence reasonably supports a finding that the mother's neglect was responsible for the child's numerous insect bites, it should be remembered that the order of commitment relied greatly upon the mother's medical neglect, and the only medical evidence relating to the same was a report written by Dr. Mark A. Brown, referring to an examination of the child made by him five days following the child's removal from the mother's care, wherein it was stated that K.H. looked "good" and that his "skin had some old resolving bug bites, no bruises or non-accidental trauma." Thus, there is nothing in the record reflecting a significant impairment to the child's physical health resulting from the numerous insect bites.
It is moreover highly unlikely that the evidence admitted in the instant case could meet even the lesser preponderance of evidence standard, required in dependency cases. Illustrative cases holding that the evidence presented was legally insufficient to support a finding of dependency on the ground of neglect include In the Interest of G.D.H., 498 So.2d 676 (Fla. 1st DCA 1986) (no showing was made that the children's physical, mental or emotional health was significantly impaired by reason of their deprivation of food, because the record disclosed that the children were required first to receive the mother's permission before removing food from the refrigerator); In re Interest of C.W., 490 So.2d 175 (Fla. 5th DCA 1986) (finding of neglect not established by evidence disclosing simply that the mother, through lack of education and experience, had failed to provide what the state considered adequate feeding for an infant child). Similarly, in the case at bar, the evidence fails to establish clearly and convincingly that the child's physical condition was substantially impaired by reason of the mother's neglect.
In addition to the lower court's finding of neglect, the court found that the mother had failed to comply with certain performance agreements, by not following the conditions that she maintain stable housing, attend counseling appointments, and show concern and care for K.H. during the time he was placed in foster care. Assuming without deciding that the mother did not conform with the items required, her failure does not constitute a sufficient legal basis for permanently terminating the parent's fundamental right to the custody of her child unless the record also discloses evidence legally supporting a finding of abuse, abandonment or neglect. See In the Interest of R.W., 495 So.2d 133 (Fla. 1986); Darkes v. Department of Health and Rehabilitative Services, 495 So.2d 873 (Fla. 5th DCA 1986). As previously observed, we have decided that the lower court's finding of neglect had no legal evidentiary support; therefore, even if there were sufficient evidence in the record that the mother had violated the provisions of the agreements, such evidence alone would not serve as a basis for permanent commitment of the child.
The lower court's order also relied upon its first order of dependency, entered when K.H. was initially removed from the custody of his mother, on facts showing that the mother had placed her child with strangers whose address was unknown; that she had spent all of her AFDC money during the first six days in September after receiving such funds; that she had sold the child's formula for cash; that she had neither properly cared for K.H., nor supervised him, and that she had moved him from residence to residence with no stable *234 home. The court's prior finding of neglect, resulting in the child's dependency status, is not of course sufficient to satisfy the burden of proving neglect in a permanent termination setting. See Darkes v. Department of Health and Rehabilitative Services. At the time of the first dependency proceeding, the evidence reflected that the mother was unemployed. Since that time she has maintained employment as a waitress and has married a man who is employed and who professes his love for the child. Additionally, many of the earlier problems recited in the order appear primarily due to the mother's insufficient financial resources to care for her child in the manner that HRS deemed desirable. Such circumstances cannot serve as clear and convincing evidence justifying termination of a parent's rights. See In the Interest of J.R.C., 480 So.2d 198, 199 (Fla. 5th DCA 1985). Section 39.01(27), moreover, forbids a finding of neglect if the cause of a parent's allowing a child to live in an environment resulting in the child's physical health to be significantly impaired is due "primarily ... [to] the financial inability [of the parent,] unless services for relief have been offered and rejected." The evidence at bar does not disclose any offer of services of relief that was rejected by the mother.
Because the state has failed to establish by clear and convincing evidence that the health of the child has been or is in danger of being significantly impaired by the mother's neglect, the order of permanent commitment is
REVERSED.
THOMPSON and WIGGINTON, JJ., concur.
NOTES
[1] She gave as reasons for her failure to notify the baby sitter: her distraught condition following the arrest, and her belief that HRS had already returned the child to its care.