OPINION OF THE COURT
Lee H. Elkins, J.
In this proceeding alleging neglect and abuse of the infant Kevin (born Oct. 11, 1998), the Commissioner of the Administration for Children’s Services (ACS) contends that the respondent father, Kurt C., caused injuries to the infant at a time when the respondent mother, Lynette T., concededly was not present, and that thereafter Ms. T. abused and neglected the child by failing to obtain medical care and by refusing to acknowledge Mr. C.’s responsibility for the infant’s injuries.
The court heard testimony on April 28 and May 24, 1999. On April 28, the court received in evidence the infant’s hospital records; the respondent father’s videotaped confession to injuring the infant; and heard thé testimony of the ACS caseworker, Ms. Hoover, and of the respondent mother, called as a witness by the Law Guardian. On May 24, the court heard the mother’s testimony on her own case, and the testimony of the paternal grandmother. The court credits the testimony of all the witnesses called, finding no significant inconsistencies in the testimony. Based on the foregoing, the court finds the following facts to be established by a preponderance of the credible evidence.
FINDINGS OF FACT
On Saturday, January 23, 1999, Kurt drove Lynette from their home in Brooklyn to New Jersey where Lynette was to work overnight as a babysitter, substituting on this occasion for a friend. They were accompanied by their three-month-old son, Kevin. Lynette was to work from Saturday morning at 10:00 a.m. overnight to Sunday morning at 7:00 a.m. Lynette left Kevin with Kurt the previous weekend, for the same time period, without incident. Lynette testified that she had left Kevin with Kurt on other occasions when she ran errands, and that there had never been a problem. Lynette lived with her husband Kurt for two years. Kurt never had abused her or the infant, physically or verbally. Lynette had seen Kurt with his other two children, a three and a four year old, by other mothers. The four year old lived with Kurt and Lynette for eight months. The three year old spent weekends with Kurt and Lynette. Lynette had never seen Kurt act otherwise than in a “loving and caring” manner toward his children. Although *388 Lynette told Kurt on the weekend of January 23 that she had arranged for an aunt to care for Kevin, Kurt insisted on caring for the infant himself. Lynette called home three times on January 23, at 11:00 a.m., 4:00 and 9:00 p.m.
On January 24, 1999 at about 2:00 a.m., Kurt C. was asleep in the bedroom in the Brooklyn apartment he and his wife, Lynette, and Kevin shared with others. The infant slept in a baby carrier on the bed. The infant woke Kurt with his crying. Kurt “got upset” and kicked the carrier “hard”, knocking the infant off of the bed and causing him to hit a dresser. As Kevin lay on the floor crying, Kurt picked the infant up by the arms and dropped him into the carrier. Kurt went to get a bottle. When he came back, Kevin refused the bottle, so Kurt, “annoyed and angry,” pinched him on the cheek and ears. Kurt then picked Kevin up and held him under his arm like a “football” while he put a sheet on the bed. Kurt then placed Kevin on the sheet to change his diaper. Still angry, Kurt forced Kevin’s legs backward until his feet touched his face. Eventually, Kevin stopped crying and took the bottle. At about 5:00 a.m., the infant woke again. Kurt noticed bruises on the infant’s right cheek and left ear. He gave Kevin apple juice in a bottle and turned on the television to watch cartoons. Kevin went back to sleep. Kurt prepared to go to work. He had to commute to Boston, where he had a job as a mover.
Lynette arrived at about 10:00 a.m.. She heard Kevin crying and believed that he was not acting normally. Kurt said that Kevin was hungry, and that the formula had “run out.” Kurt did not tell his wife what he had done, or that anything unusual had happened to the baby. Lynette asked her husband when he last fed Kevin. Kurt told her that the infant last ate at 7:00 a.m. Lynette immediately went out to buy formula for Kevin, as Kurt was in a hurry to get to work. Lynette returned with the formula after five minutes, and Kurt left. The baby continued to cry and Lynette attempted to comfort him, by holding and talking to him. As she tried to feed the infant, Lynette noticed a blue mark on Kevin’s cheek and a red mark on his forehead. She knew she would be unable to reach the father, who was on his way to Boston. As the infant continued to cry, the mother called a close friend and older woman, Ms. Paul, whom she described as “like a mother” to her. Ms. Paul had given the mother advice when Kevin had “grippe.” Lynette called Ms. Paul at her job, a little after 11:00 a.m. Lynette told Ms. Paul about the marks on the infant’s face. Ms. Paul arrived at about 11:15 and stayed 15 minutes, rubbing Kevin’s *389 back and feeding him. Kevin fell asleep and Ms. Paul put him in his crib. The infant woke again soon and continued to cry constantly. Kevin refused to eat. Lynette managed to reach Kurt through his beeper. She told him about the mark on the infant’s forehead and cheek, and noted that Kevin seemed to have a fever. She asked Kurt if the infant had fallen. Kurt denied that Kevin fell. According to the caseworker, Lynette told Kurt that she was calling Emergency Medical Service (EMS). Kurt told her to “go ahead.” According to Lynette’s testimony, Kurt advised Lynette to call an ambulance if the fever did not go down. Lynette burped the baby and began to change his diaper. She placed Kevin on the bed and when she touched his foot, he gave a loud scream. She removed his sleeper and his socks. She saw that his foot was swollen. She again called Ms. Paul, who advised her to call the paternal grandmother, who is a nurse’s assistant. Lynette called the paternal grandmother at about 12:20 p.m. Lynette explained that the infant was crying a lot and that she did not know what was wrong with him. The grandparents arrived at about 1:00 p.m. The grandmother looked the infant over, removing his clothes. The grandmother testified that she could not tell what was wrong with Kevin by looking at him. Lynette told her that the infant’s foot was swollen. The grandparents advised Lynette to call EMS. According to the ambulance call report, Emergency Medical Service received the call at about 2:35 p.m.
It appears that Kevin arrived at Kings County Hospital at about 3:00 p.m. The pediatric ambulatory care report indicates that- the infant’s temperature first was recorded at the hospital at 3:21 p.m. Significantly, the ambulance call report indicates that Lynette told the dispatcher precisely what she described in court as having observed. She told EMS that Kevin had a fever; that he was “easily distracted”; that he cried a lot when his left foot was touched; and that he had a red mark on his forehead. Lynette’s account of the event was consistent beginning with the call to EMS, through the medical, ACS and police investigation, and in court. The triage nurse’s form, completed at 3:21 p.m., noted the following: a fever of 102.6 F; a swollen and tender left foot; a small bruise on the right side of the forehead and redness to the left cheek. It also was noted that Kevin had a cough and had been diagnosed as having a respiratory problem IV2 months before. A further examination revealed a .3-millimeter purple bruise by the left ear; a .3-to-.5-millimeter purple mark on the left cheek; a 1-centimeter square *390 abrasion under the chin on the right side; a red .5-centimeter bruise on the right forehead; swelling and tenderness of the left ankle and a reddish purple band on the back of the left calf; .3-to-.5-millimeter and . l-to-.2-millimeter bruises in the left groin and abdomen area. When admitted to the hospital, Kevin cried but was consolable, and had an appetite. Following a skeletal survey the doctors found Kevin to have spiral fractures of the left and right tibia. Initially, the doctors believed that Kevin had multiple fractures, including posterior fractures of several left and right ribs, and a fracture of the lower skull. However, a note by the pediatric child abuse specialist attending, made on January 25 at about 11:15 a.m., reads “x-rays were done which initially suggested rib fractures and skull fractures and leg fractures. Upon reviewing films with Dr. Haller, the child has left distal tibia/fibula fractures and right proximal tibia fracture. There are no rib fractures.” There was evidence that the infant had been subject to “pressure” in the area of his ribs. It was determined that there was no skull fracture.
The hospital records indicate that the social worker recommended discharging Kevin to his mother. When told by the caseworker about the doctor’s findings and the father’s confession to the police, the respondent mother said: “I can’t believe he did it. He has other children. We never had an argument. He’s a gentle person * * * I don’t believe he did that.” The respondent mother also testified that the police told her Kurt confessed. Lynette had not spoken to her husband, who was in jail, as of the date of these interviews. The respondent mother testified that she was in shock, and that this was not the person she knew the father to be. She testified that she was unable emotionally to believe that her husband had hurt the child. Kevin was put on social hold, and application for remand made to and granted by this court. In court, Lynette continued to express her disbelief that Kurt had caused the injuries to the child. She expressed her inability to accept this information even though she watched Kurt’s videotaped confession. She testified that she did not know what to believe. She also testified that although the infant is not in her care, she has separated from her husband and maintains her own residence. She also expressed her intent to enforce any order of protection issued in favor of Kevin against Kurt.
CONCLUSIONS OF LAW
The foregoing facts clearly establish that Kurt C. abused Kevin, within the meaning of Family Court Act § 1012 (e) (i). *391 Respondent C. broke both of Kevin’s legs, by other than accidental means. As a result of these injuries, the infant was hospitalized for four days. In the court’s opinion, these injuries constitute a protracted impairment of the infant’s physical condition. Alternatively, it is fortuitous that the injuries were not more serious, given the callous disregard with which the respondent father admittedly kicked the infant’s carrier from the bed and his subsequent enraged and uncontrolled actions toward this extremely vulnerable three month old. Consequently, the court also finds that the respondent C.’s actions placed the child at substantial risk of protracted impairment of the infant’s physical health.
In the court’s opinion, the foregoing evidence fails to establish that Lynette either allowed Kurt to abuse Kevin, or that she neglected Kevin by failing promptly to obtain medical attention for his injuries. The child was not in her care at the time of the events causing his injuries. There can be no serious contention that the respondent mother abused the infant. When the issue is whether a parent allowed her child to be abused within the meaning of Family Court Act § 1012 (e) (i) and (ii), “the test is whether a reasonable and prudent parent would have acted [to protect the child] under the circumstances presented.” (See, e.g., Matter of Eric J., 223 AD2d 412, 413 [1st Dept 1996].) Although the standard is an objective one, it does not impose absolute liability. As the Court of Appeals has noted, “The statute is fault based. There must be evidence of child abuse and petitioner must establish it by ‘a preponderance of the evidence’ (Family Ct Act § 1046 [b] [i]; and see, Matter of Tammie Z., 66 NY2d 1).” (Matter of Philip M., 82 NY2d 238, 243-244 [1993].) There must be evidence from which it may be inferred that a reasonable parent in the respondent’s position should have known of the potential for abuse, and consequently failed to exercise a minimum degree of care in preventing the abuse. (See, e.g., Matter of Scott G., 124 AD2d 928 [3d Dept 1986].) Here the uncontroverted evidence shows that the respondent mother had no reason to believe that her husband of two years would injure their three-month-old infant. There is no evidence that the respondent father ever had acted in any manner so as to place the infant at risk of any kind, much less a substantial risk of physical injury to the degree required by the abuse statute. (Family Ct Act § 1012 [e] [i], [ii].) On the contrary, the respondent mother testified that she had observed her husband with his other children and that he was loving and caring. She testified that he had never been *392 abusive to her, verbally or physically. She described him as a gentle person. She left her infant in his care in the past without incident. Consequently, the respondent mother simply had no reason to believe that the infant would be at risk in his father’s care. {See, e.g., Matter of Desiree X., 129 AD2d 841 [3d Dept 1987].)
Similarly, with regard to medical neglect, the record shows that the respondent mother exhibited appropriate concern for the infant’s needs. As previously noted, the respondent mother had no reason to believe that the infant’s father had injured him. While in retrospect the marks on the child clearly were evidence of inflicted trauma, the respondent mother initially had no cause to suspect that the infant had been abused. The father denied that anything unusual had happened to Kevin. Despite the father’s reassurances, the respondent mother appropriately sought the advice of others more knowledgeable, beginning with Ms. Paul. She sought Ms. Paul’s advice within an hour of returning home. There is nothing in the record to indicate that Ms. Paul recognized that the infant had been injured or abused. Ms. Paul left after consoling Kevin. When Kevin continued to show signs of discomfort, and the respondent mother reached her husband, shortly after noon, she confronted him, asking whether Kevin had fallen. That she did not immediately reject her husband’s denial does not rise to the level of neglect. The respondent mother continued to seek advice after she discovered that the infant’s left foot was painful to the touch. She called Ms. Paul a second time and then spoke to the paternal grandmother who is a nurse’s assistant. The paternal grandmother testified that she was at the respondent mother’s home by 1:00 p.m., three hours after the mother arrived home. Ultimately, at the suggestion of the paternal grandmother, the respondent called EMS. The petitioner argues that the failure immediately to call EMS amounts to a failure to exercise a minimum degree of care to be expected of a reasonable parent. Obviously, the petitioner would be correct had the mother known, or had the circumstances been such that a reasonably prudent parent would have known, that the infant was abused or was injured and required medical attention. What the petitioner disregards is the absence in the record of any evidence that the observable injuries indicated an immediate need of medical attention. The triage form completed by the first nurse to see Kevin indicates precisely what the respondent mother testified she observed: that he had a fever of 102.6 F; a swollen and tender left foot; a small bruise on the *393 right side of the forehead and redness to the left cheek. The other bruises seen upon closer examination, while significant as a pattern, were all smaller than half a millimeter, ranging in size from .1 millimeter to between .3 and .5 millimeter. There is no evidence that the fractures immediately were apparent even to the examining doctors. Rather, the fractures were discovered by a skeletal survey. Consequently, the court does not find that the respondent mother’s conduct in failing immediately to summon emergency medical assistance amounted to a failure to exercise a minimum degree of care in obtaining medical attention for the child. Nor is there any evidence that the delay in summoning medical attention in any way contributed to an impairment of the infant’s physical condition. (See, e.g., Matter of Jessica SS., 229 AD2d 616 [3d Dept 1996].)
The petitioner would have the court make a finding of abuse against the respondent mother based upon her difficulty in accepting that her husband is capable of causing the harm he has confessed to committing. Certainly, had the respondent mother reconciled with the father and allowed him access to the infant after he admitted to causing these injuries, there would be a cause of action for neglect based upon the respondent’s failure to exercise a minimum degree of care to protect the child from the risk of future harm. (See, e.g., Matter of Scott G., 124 AD2d 928 [3d Dept 1986], supra.) The issue presented is whether the same result should follow from the respondent mother’s difficulty in accepting her husband’s conduct. In this case, the respondent mother has done nothing, either by commission or by omission, to place her child at risk of physical injury. Significantly, the respondent mother never denied that her husband injured their infant. In fact, she has taken steps that a reasonable, prudent parent confronted with the risk that her child may be harmed by the other parent, would take under such circumstances. The mother has separated from the respondent father and despite her own access to the infant in the kinship foster home, has not facilitated the father’s contact with the child, but has expressed her intent to enforce the court’s order keeping him away from the infant. Consequently, the facts of this case are not analogous to those cases where a parent allows access to her children by a person who she knows presents a risk to their safety. Nor are these facts analogous to those cases in which at disposition, following a finding that the parent has placed her children at risk in the past, the court must assess the potential future harm to the *394 child by the parent. (See, e.g., Matter of Commissioner of Social Servs. of City of N. Y. [Trudy I.] v Leona W., 192 AD2d 602 [2d Dept 1993]; Matter of Umer K., 257 AD2d 195 [1st Dept 1999]; Matter of Valerie Leonice T., 107 AD2d 327 [1st Dept 1985].) In such cases, the court’s orders are based upon a finding of parental fault, whether by act or omission. In this court’s view, to find that the respondent mother may in the future fail to intervene to protect the child from her husband based upon nothing more than her incredulity about her husband’s acts, would eradicate the element of fault from the statute altogether.
As the Law Guardian correctly notes, even though no finding of neglect against the mother is warranted, the court may impose conditions on the release of the child to the mother, under Family Court Act § 1054. That section enables the court to place the mother to whom the infant is released under the agency’s supervision as a corollary to the dispositional order based upon the finding of abuse by the father. Such an order may include a requirement that the mother “cooperate with the supervising agency in remedying specified acts or omissions found at the fact-finding hearing to constitute or to have caused the neglect or abuse.” (Uniform Rules for Trial Cts [22 NYCRR] § 205.83 [b] [2].) The court also has the authority to direct the mother to “do or refrain from doing any other specified act of omission or commission that, in the judgment of the court, is necessary to protect the child from injury or mistreatment and to help safeguard the physical, mental and emotional well-being of the child.” (Uniform Rules for Trial Cts [22 NYCRR] § 205.83 [b] [7].) In addition, the court may issue an order of protection binding on the mother pursuant to Family Court Act § 1056, in assistance of the dispositional order issued against the father. (See, e.g., Matter of Christina I., 226 AD2d 789 [3d Dept 1996]; Matter of William GG., 222 AD2d 752 [3d Dept 1995].)
As to the father, the court has entered a final order of protection for a one-year period, directing that he remain away from the infant and from the separate home established by the mother. During the period of the order of protection, he must undergo a course of therapy to discover and to treat the causes of his abuse. Despite the respondent mother’s difficulty in accepting her husband’s conduct, there is nothing to indicate that she would refuse to enforce an order of protection against the father, on behalf of the child. (See, e.g., Matter of Nichole B., 175 AD2d 205 [2d Dept 1991].)
*395 As to the mother, the child is released to her custody under the supervision of the Administration for Children’s Services, pursuant to Family Court Act § 1054. Although the neglect and abuse petition is dismissed as to the mother, the mother is placed under the agency’s supervision upon the following conditions: (1) the mother is to enforce the order of protection against the father; (2) the mother, with agency assistance, is to enroll in individual counseling to assist her to accept her husband’s abuse of the child, and to determine whether her own attitudes or behavior contributed to her failure to foresee her husband’s abuse of the child; (3) the mother is to enroll in and to complete a parenting skills course to assist her to understand the causes of child abuse, and to assist her to detect any warning signs of future child abuse.