1999 Utah Ct. App. 345

**STATE of Utah, In the Interest of N.K.C., a person under eighteen years of age.**

**M.W., Appellant,**

v.

**State of Utah, Appellee.**

**No. 981701–CA.**

Court of Appeals of Utah.

Dec. 2, 1999.

Jim C. Shirley, Laherty & Assocs. PC, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., and John Peterson, Atty. Gen.'s Office, Salt Lake City, for Appellee.

Martha Pierce and Susan Eisenman, Salt Lake City, Guardians Ad Litem.

Before GREENWOOD, Associate P.J., and BENCH and ORME, JJ.

## OPINION

ORME, Judge:

¶ 1 M.W. appeals the juvenile court's determination that her child, N.K.C., was a "neglected child," as defined in Utah Code Ann. § 78–3a–103(1)(r)(i)(C) (Supp.1999), because she failed to secure immediate medical attention for the child. We conclude the juvenile court properly determined, given the stipulated facts, that the child was medically neglected. We therefore affirm.

## BACKGROUND

¶ 2 The facts in this case are undisputed and were stipulated to by all parties. On the evening of April 9, 1998, the mother, the one-month-old child, and the child's father returned to their apartment in Salt Lake City from a trip to southern Utah. Sometime around 10:00 p.m., the mother left to go buy ice cream and was gone for about twenty minutes. During the short time she was gone, the father became angry and vigorously shook the child. When the mother returned, she observed that the child was limp and lethargic. The father, in the mother's presence, shined a flashlight in the child's eyes and observed that his pupils were fixed. Rather than seek medical help for the child, the mother and father put the child to bed.

¶ 3 At approximately 1:00 a.m., the mother awoke and checked on the child. Not surprisingly, she found him in the same torpid condition and discovered that he would not nurse. The mother expressed a desire to take the child to the hospital at that time, but was dissuaded by the father. At about 2:00 a.m., the mother called the child's pediatrician, who directed the mother to immediately take the child to Primary Children's Hospital. The telephone conversation lasted approximately thirty minutes.[1] Finally, at 3:02 a.m., almost five hours after initially discovering the child's dire condition, the mother arrived with the child at the hospital.

¶ 4 The child was examined and found to be suffering from severe injuries, including major retinal hemorrhaging, causing blindness; deafness; low to no brain activity; pressure on the brain; a loss of sucking and swallowing reflexes, which necessitated the insertion and use of a feeding tube; diabetes-insipidus; intracranial bleeding; and seizures. The examining doctor determined that these injuries stemmed from nonaccidental trauma. The medical staff later determined that the child had also suffered a nonaccidental fractured rib, caused by squeezing the child, and a nonaccidental bruised toe, caused by pinching the child.

¶ 5 Hospital personnel, believing that the child had been abused, alerted the Division of Child and Family Services (DCFS). The child was taken into protective custody by DCFS. On April 22, a Verified Petition was filed and a shelter hearing was held. The juvenile court awarded temporary custody and guardianship of the child to DCFS. An Amended Verified Petition was filed two

---

1. It is unclear from the stipulated facts if the length of the telephone conversation, which seems extraordinary given the time of night and the severity of the child's injuries, was a result of the doctor's trying to determine the severity of the problem over the phone, or, understanding the severity, attempting to convince the mother to take the child to the hospital.

months later, alleging that the father had physically abused the child and that the father and mother had "neglected the child by failing to obtain timely medical care." The petition regarding the father was promptly adjudicated, but the court granted a motion to continue the mother's trial. In the father's Adjudication Order, the juvenile court concluded that the child was abused within the meaning of the statute because the child suffered life-threatening physical abuse at the hands of his father and because the father neglected the child by failing to obtain timely medical care. *See Utah Code Ann.* § 78–3a–103(1)(a) (Supp.1999). These findings regarding the father are not at issue in this appeal.

¶ 6 In July 1998, the Amended Verified Petition was adjudicated regarding the mother on the facts stipulated to by the parties and summarized above. The juvenile court concluded that the mother "neglected the child by failing to obtain timely medical care."

## ISSUES AND STANDARD OF REVIEW

■ ¶ 7 In the juvenile court, neglect must be established by clear and convincing evidence. *See* Utah R. Juv. P. 41(b). The mother argues on appeal that the juvenile court's conclusion that she neglected the child when she delayed seeking medical treatment is not supported by the stipulated facts, especially because the child's condition did not demonstrably worsen in the five hours before he was taken to the hospital. Given that the facts were stipulated, we review the conclusions drawn by the juvenile court for correctness. *See, e.g., Stephens v. Bonneville Travel, Inc.,* 935 P.2d 518, 519 (Utah 1997); *Sacramento Baseball Club, Inc. v. Great Northern Baseball Co.,* 748 P.2d 1058, 1059–60 (Utah 1987).

2. As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

3. The phrase "necessary and proper" as used in the United States Constitution, *see* Art. I, § 8, has

## ANALYSIS

■ ¶ 8 A " '[n]eglected child' is a minor ... whose parent, guardian, or custodian fails or refuses to provide proper or necessary subsistence, education, or medical care, including surgery or psychiatric services when required, or any other care necessary for health, safety, morals, or well-being[.]" Utah Code Ann. § 78–3a–103(1)(r)(i)(C) (Supp.1999).[2] The mother contends that if the child was no worse off because of a five-hour delay in taking him to the hospital, what she did (or did not do) cannot be considered medical neglect. We disagree and conclude the stipulated facts clearly set forth circumstances in which a reasonable parent would understand the need for immediate medical treatment. We conclude the mother's delay constituted neglect under the statute.

■ ¶ 9 "A fundamental rule of statutory construction is that statutes are to be construed according to their plain language." *O'Keefe v. Utah State Retirement Bd.,* 956 P.2d 279, 281 (Utah 1998). The definition of neglect in section 78–3a–103(1)(r)(i)(C) is consistent with the derivative term "negligence" as used in the tort context, which "simply means the failure to use reasonable care." *Ortiz v. Geneva Rock Prods., Inc.,* 939 P.2d 1213, 1216 (Utah Ct.App.1997). The only difference is that rather than focusing on the "prudent person ... in similar situations," *id.,* the statute refers to the "proper or necessary" conduct of a "parent, guardian, or custodian." Utah Code Ann. § 78–3a–103(1)(r)(i)(C) (Supp.1999).

¶ 10 Black's Law Dictionary defines the similar phrase "necessary and proper" as meaning "appropriate and adapted to carrying into effect [a] given object." *Black's Law Dictionary* 1029 (6th ed.1990). In common usage, the phrase simply means "appropriate." [3] *See Stauffer v. Miller,* 79 Ohio App.3d 100, 606 N.E.2d 1037, 1040 (1992).

been given much the same construction. The phrase contemplates not only governmental actions that are "absolutely and indispensably necessary," but also "all appropriate means which are conducive or adapted to the end to be accomplished." *Juilliard v. Greenman,* 110 U.S. 421, 440, 4 S.Ct. 122, 125–26, 28 L.Ed. 204 (1884).

**4**

The plain meaning of neglect in this statutory context bespeaks a reasonable parent standard, governed by what action on the part of a parent would be reasonable or appropriate in similar circumstances. Therefore, to determine if the mother's conduct constitutes medical neglect in this instance, we must square her conduct against the appropriate conduct of a reasonable parent, guardian, or custodian who finds a child in like condition.

¶ 11 We note that while jurisdiction over the child is not always based on the conduct of a parent, *see In re K.T.S.,* 925 P.2d 603, 604 (Utah Ct.App.1996), our statute focuses primarily on the parent's conduct in light of the child's needs. *See* Utah Code Ann. § 78-3a-103 (Supp.1999). A reasonable parent standard comports with this policy; a perspective focused on the largely fortuitous circumstances of whether, in hindsight, parental neglect proximately caused physical harm does not.[4]

■ ¶ 12 Nonetheless, the mother argues that even if we adopt a reasonable parent standard, she did not medically neglect her child because the alleged medical neglect must also have caused some additional impairment or worsening of the child's condition. Thus, appellant suggests we adopt what she characterizes as the New York standard for determining medical neglect. In New York, a child is regarded as neglected if (1) the parent "did not exercise a minimum degree of care" and (2) "as a result, the child's physical, mental or emotional condition was impaired or in imminent danger of being impaired." *In re Jessica SS,* 229 A.D.2d 616, 644 N.Y.S.2d 854, 856 (1992). *Accord In re Jessica YY,* 258 A.D.2d 743, 685 N.Y.S.2d 489, 491 (N.Y.App.Div.1999). If ei-

ther of these two elements is missing, a parent cannot be found to have medically neglected the child. *See Jessica SS,* 644 N.Y.S.2d at 856.

¶ 13 This two-part standard is a statutory creation in New York, similar to statutes in some other jurisdictions. *See* N.Y. Family Law § 1012(f)(i) (Consol.1999). *See also* N.J. Stat. Ann. § 9:6-8.21 (West 1999); *In re K.H.,* 527 So.2d 230, 232 (Fla.Ct.App.1988) (explaining previous version of Fla. Stat. ch. 39.01(46) (1998), which defined neglect as conduct that "causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired"). However, such a standard does not logically flow from our statute, as the Utah Legislature has not adopted similar "impairment" language in this context.[5] "Despite [the mother's] efforts to add additional elements to the statute, we find [this section] to be clear and unambiguous.... [Thus] we conclude that [the mother's] interpretation is untenable." *State v. Singh,* 819 P.2d 356, 359 (Utah Ct.App.1991), *cert. denied,* 832 P.2d 476 (Utah 1992).

¶ 14 While a worsened condition due to a delay in seeking medical help may strengthen a determination of medical neglect, it is not a prerequisite to such a determination. A parent should not benefit from the happenstance that her child's condition did not worsen when negligence on her part kept the child from receiving proper medical attention immediately.

■ ¶ 15 Utah's statute is designed to provide a flexible standard that avoids unintended loopholes. Utah's standard—"proper or necessary" conduct by a reasonable parent—begins and ends with an inquiry into the appropriateness of the parent's conduct, and

---

4. As discussed at oral argument, given the statute's focus on parental conduct, a parent who tosses her child out a twenty-story window, only to have the child land unscathed on a pile of mattresses and bedding, will not get far in arguing that her conduct was not sanctionable because no harm actually came to the child. Nor will a parent who does not feed his child have any success in pointing out that the child thrived on what it found in the dumpster behind a nearby restaurant.

5. In the context of criminal child abuse, the Legislature has defined "physical injury" as meaning "an injury to or condition of a child which impairs the physical condition of the child," but as including "any ... condition which imperils the child's health or welfare." Utah Code Ann. § 76-5-109(3)(1)(C) (1999). Even given this phraseology, we have held that dangling a child over a balcony constituted child abuse, although no harm came to the child, because the "unfathomable" act imperiled (i.e., endangered) its welfare. *Provo City v. Cannon,*

is not deflected by the sometimes speculative question of whether a child's condition actually worsened due to a parent's neglect. In our view, it does not matter if the child's condition worsened, improved, or remained unchanged during the delay; the pivotal question is what action by the parent was proper under the circumstances. In this instance, where the severity or permanence of the obviously serious conditions were undiagnosed and unknown, and the mother noted the grave condition of the child, the only proper course was to summon medical attention immediately.

 ¶ 16 The mother vigorously argues that applying a "reasonable parent" standard creates a framework in which parents who do not seek immediate attention for children suffering from even the slightest injuries will risk being found to have abused or neglected them. We disagree. Our approach contemplates the standard of care of a reasonable parent in the same situation. "[T]he test is whether a reasonable and prudent parent would have acted ... under the circumstances presented." *In re Eric J.*, 223 A.D.2d 412, 636 N.Y.S.2d 762, 763 (1996). A reasonable parent will not take a child to the hospital for a bee sting, the common cold, or a simple sliver. Children who unexpectedly become violently ill because they are hypersensitive to such injuries or conditions would not be termed abused or neglected if the parents acted reasonably in caring for the condition.[6] It is usually completely reasonable for a parent to wait and see if a minor ear ache gets better or a cough persists, or for a parent to treat the initial onset of fever with a teaspoon of Ibuprofen oral suspension or a scrape or minor cut with topical antibiotic and a band-aid. However, waiting even an hour when a child is suffering from an obvi-

ous and serious injury is ordinarily not reasonable and could support a determination of medical neglect. *Cf. In re Jerry M.*, 78 Misc.2d 407, 357 N.Y.S.2d 354, 358 (N.Y.Fam.Ct.1974) (holding mother neglected child when she discovered it was suffering from potentially life-threatening injury, bleeding from head and face, but delayed seeking medical help).

¶ 17 The standard we embrace is flexible and depends on the actual circumstances involved, as shown by a New York case.[7] In *In re Kevin T.*, 181 Misc.2d 386, 693 N.Y.S.2d 907 (N.Y.Fam.Ct.1999), medical neglect was alleged under circumstances similar to our case, but the mother responded differently and was found to have acted reasonably. *See id.* at 907–10. Lynette, the mother, left her three-month-old son at home with Kurt, the father, when she went to work as an overnight babysitter. Unknown to Lynette and in her absence, Kurt severely abused the child, who had the audacity to cry during the night, disturbing Kurt's slumber. *See id.* at 908. At 10 a.m., when Lynette arrived home, she heard the baby crying and believed something was not right. Kurt explained that they had run out of formula and the baby was just very hungry. Behaving as a reasonable parent would, Lynette immediately bought formula and fed the child, but he continued to cry. *See id.* Suspecting something more was wrong, but seeing no physical signs other than a small bruise on the child's face, she called a friend who could find nothing wrong, but was able to comfort the baby temporarily. *See id.* Still the problem persisted and the child began to cry constantly. Lynette then changed the baby's diaper, and when she touched the baby's foot he screamed. Lynette, concerned by this, next enlisted the help of the paternal grand-

---

1999 Utah Ct.App. 344, ¶¶ 13–14, 994 P.2d 206 (1999).

6. If a parent were aware of a particular hypersensitivity and failed to act, the outcome may differ. For example, if a child were stung by a bee, and a parent learns of it, knowing the child has a history of severe reactions to stings—the child's throat closes, hives appear, the child is unable to breathe, and the parent has been told in the past to give the child an epinephrin shot and call an ambulance—a parent who instead puts the child to bed to "sleep it off" would be

medically neglectful. Certainly a reasonable parent in the same situation would act differently. This judgment does not change even if by divine intervention or some fortuitous circumstance the child has no reaction to this particular sting and is none the worse for it.

7. As previously discussed, the New York statute requires a showing of impairment as well as a failure to act reasonably under the circumstances. This case is nonetheless insightful because it turns on the reasonable conduct prong of New York's two-part test, which is the sole focus of the Utah statute.

mother who removed all of the baby's clothing but saw no obvious problems. *See id.* at 909. Having acted reasonably and finding no physical signs, but seeing the child was still in distress, Lynette finally called for an ambulance. A skeletal survey was performed at the hospital and revealed spiral fractures in the left and right tibia that were not obvious from any outward examination. *See id.* at 909, 911.

¶ 18 Perhaps the perfect mother would have taken the baby to a physician sooner, or been more suspicious of the cause of even a small bruise on the baby's face. But perfection is not required, and the New York court held Lynette took reasonable action under all the circumstances. The court explained:

> The petitioner argues that the failure immediately to call [for medical help] amounts to a failure to exercise a minimum degree of care to be expected of a reasonable parent. Obviously, the petitioner would be correct had the mother known, or had the circumstances been such that a reasonably prudent parent would have known that the infant was abused or was injured and required medical attention. What the petitioner disregards is the absence in the record of any evidence that the observable injuries indicated an immediate need of medical attention.

*Id.* at 911.

■ ¶ 19 As illustrated above, the reasonable parent standard, similar to a reasonableness standard in torts, includes a full range of conduct on the part of parents and guardians. "Reasonable care does not require extraordinary caution or exceptional skill. Reasonable care is what an ordinary, prudent [parent] uses in similar situations." *Ortiz,* 939 P.2d at 1216.

¶ 20 The mother in the instant case did not meet the reasonable care standard. While she argues that she was concerned about her child's condition and should not be judged in hindsight because, at the time she observed the child, she could not have diagnosed all the problems the child was experiencing, her argument misses the point. No one expected her to make a diagnosis, only to "exhibit[ ] appropriate concern for the infant's needs" given the observable evidence. *In re Kevin T.,* 693 N.Y.S.2d at 910. She was expected to recognize what any reasonable parent would: there was something seriously wrong with her baby and immediate medical attention was manifestly in order.

¶ 21 Perhaps the mother was unaware of the severity of her child's condition when he appeared limp and lethargic. Perhaps she did not fully understand the precise significance of fixed pupils and the child's inability to nurse. A reasonable parent standard may accommodate the cautious and the hesitant,[8] but it cannot accommodate inaction in the face of an obvious cause for immediate concern. Nowhere in the reasonable parent standard is there leeway for a parent who finds a child limp and lethargic with fixed pupils, who then puts the child to bed hoping he will simply get better. Such conduct is well outside that which can reasonably be expected of a parent in that situation.[9] Consequently, the mother's failure to summon immediate medical attention amounted to a failure to exercise the minimum degree of care expected of a reasonably prudent parent.

## CONCLUSION

¶ 22 Medical neglect is determined by a reasonable parent standard. On the facts stipulated to by the parties, the trial court

8. New parents may rush to the emergency room because of the slightest quiver or cough from their baby. More experienced parents usually hesitate to take immediate action for all but the seemingly serious coughs, quivers, or medical maladies. Neither of these two examples of conduct would typically fall outside of the range of reasonable parental conduct.

9. In the case before us, the mother's willingness to be talked out of going to the hospital by the father is similarly outside the range of conduct expected of a reasonable parent. Had the child's symptoms been consistent with colic, easily explained away as a minor illness of infancy, the result might differ. In the present circumstances, there was no explanation for the baby's sudden and serious symptoms other than a major medical problem, and the mother's reluctance to believe this fact does not matter; a reasonable parent would have grasped the gravity of the situation and sought immediate medical help.

correctly ruled that the child was neglected by his mother because she failed to summon immediate medical attention.

¶ 23 Affirmed.

¶ 24 I CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge.

¶ 25 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Judge.