Matter of X.B. (2006 NY Slip Op 50559(U))

[*1]

Matter of X.B.

2006 NY Slip Op 50559(U) [11 Misc 3d 1074(A)]

Decided on March 29, 2006

Family Court, Monroe County

O'Connor, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through April 24, 2006; it will not be published in the printed Official Reports.

Decided on March 29, 2006

Family Court, Monroe County
In the Matter of X.B., A Child under the Age of Eighteen Years Alleged to be Abused and Neglected by N.A. and A.D., Respondents.
NA 09139-05

Charles Baisch, Esq., Deputy County Attorney, for and with Petitioner DHS
Daniel Aureli, Esq., for and with Respondent N. A.
James E. Brown, Esq., for and with Respondent A.D.
Sue Laragy, Esq., Law Guardian
Christine Redfield, Esq., Assistant Public Defender, for and with Interested Party L. B.

Marilyn L. O'Connor, J.
The Monroe County Department of Human Services filed a petition under Article 10 of the Family Court Act on July 25, 2005 against both respondents, N. A. and her boyfriend, alleging that their treatment of the woman's 31-month-old son, X. (born 2002), caused him to be an abused or neglected child. Respondent A.D., the mother's boyfriend, was alleged to be a person legally responsible for the child's care because he lived with the respondent mother and the boy at the relevant times and was the primary care taker when the mother was working (Family Court Act, § 1012[g]) . The petition alleged that the respondents had abused the little boy by inflicting or allowing to be inflicted non-accidental physical injury which caused or created a substantial risk of death or serious or protracted disfigurement or protracted impairment of physical or emotional health or protracted impairment of the function of any bodily organ (FCA § 1012[e][i]). Alternatively the petition alleged that the respondents had abused the child by creating or allowing to be created a substantial risk of physical injury other than by accidental means which would be likely to cause the same harm (FCA § 1012[e] [ii]). [*2]Additionally, based on the same facts, the petition alleged that X. was a "neglected child", i.e., "a child less than eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care". It was specifically alleged that the respondents had neglected the child by failure to provide adequate supervision and guardianship (FCA § 1012[f][i][B]). The most important allegations were that the child suffered an injury sufficient to cause blood in his abdominal cavity and a probable laceration of the spleen, resulting in his hospitalization for approximately one week. Both respondents denied any knowledge of how the boy was injured and any responsibility therefor. The petition did not allege how the injury occurred, and the matter went to trial because issues remained as to how the injury to the child happened and who was directly responsible for it. For the reasons set forth below, the respondent A. D. is found to have abused the boy (FCA § 1012[e][i]), and the respondent N. A. is found to have neglected her son (FCA § 1012[f][i][B]).
THE BURDEN OF PROOF
The critical question in this case is whether the preponderance of the evidence established the culpable responsibility of the respondents when the descriptive details of how the abdominal bleeding occurred never were established by the evidence. This is not a criminal case requiring proof beyond a reasonable doubt. Nor is it a case of severe or repeated abuse requiring a determination based on clear and convincing evidence (Family Court Act, § 1047[b][ii]). Determinations that a child is abused or neglected need only be based on a preponderance of evidence (Family Court Act, § 1047[b][i]). As stated in section 1046(a)(ii) of the Family Court Act,

In any hearing under this article. . . proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the care of such child shall be prima facie evidence of child abuse or neglect, as the case may be, of the parent or other person legally responsible; . . . .
CREDIBILITY
Credibility is determined by the trier of fact. The petitioner called three witnesses - (1) Michelle Leonard, case worker; (2) Dr. Ann Blane, board certified in pediatrics and emergency pediatrics, and an associate professor of emergency medicine in pediatrics, a Golisano Children's Hospital Pediatric Emergency Department physician, and the medical director of the hospital's REACH program (Referral and Evaluation of Abused Children); and (3) Jean Martin, maternal grandmother of the injured boy. The two respondents themselves were the only other witnesses.
The court credited the testimony of the disinterested witnesses-i.e., the doctor and the caseworker, and discounted the evidence of the interested parties and witness-i.e., respondents and the maternal grandmother. The testimony of the latter three presented a "see-no-evil, hear-no-evil, speak-no-evil" defense. That defense, whether constructed by actual collusion or resulting from general denials, appeared intended to persuade the court that the boy innocently suffered his serious blunt force trauma injury through some unexplained, unseen, unheard [*3]accident. Implicit in their position is that the necessary "accident" must have somehow occurred out of the sight and hearing of everyone and left no clues which would have revealed how the injury happened. This is not credible. The injured little boy, because he was only 2 ½ years old, should have been carefully supervised at all times by some responsible person, as required by law. Indeed, all the evidence, including that of the interested respondents and the maternal grandmother, establishes that the little boy was always under the supervision of an adult. Thus, someone knows what happened and is not telling the truth.
THE UNCONTESTED FACTS
The investigating case worker, Michelle Leonard, set up the basic premise of the case with her testimony. She testified she became involved on July 5, 2005, when a referral came from Strong Memorial Hospital regarding X.'s injuries, for which there was "no natural cause". She learned the identities of the respondents, including that respondent A. D. was involved with the care of the child. She testified as to the basic outline of events preceding the child's injury, many of which are set forth below, and importantly testified that she had reviewed all the records and there was not a scintilla of suspicion that the injury was directly attributable to the mother.
The uncontested facts show that the respondents met in October of 2004, and A. D. moved in with the child's mother in January 2005. He started babysitting for the child in May of 2005, while the mother worked.
It is also uncontested that the respondent mother routinely used a number of relatives to babysit her child and transport him from place to place because she worked. The four days before the injury followed this somewhat haphazard extended-family approach to the boy's day care needs. However, the boy was returned to the respondents' care at or about 8:30 PM on Thursday, June 30, 2005, by the mother's mother, cousin and two sisters, after eating a meal of chicken mcnuggets and playing under the maternal grandmother's supervision. He stayed at home that night, where only the respondents were present, and he slept with a baby monitor nearby. The respondent mother, not A. D., put him to bed. A. D. testified he heard nothing on the baby monitor that night to alert him to any problem. (The mother was not asked if she heard anything via the baby monitor.)
The respondent mother left for work at 7:30 AM, July 1, 2005, after peeking on her son twice and seeing that he was still asleep. She left the boy in the care of A. D. According to the respondent A. D., the boy did not throw up until Friday morning after the mother left for work. First, he threw up around 9:15 AM. A. D. phoned the mother, reporting that the child had thrown up, was not acting well, was pale, and had blueish lips. The boy threw up a second time, and A. D. called the mother again. That second call came at about 10:30 AM per the respondent mother and the mother went home. The toddler was thereafter on that same day taken to Rochester General Hospital by the respondents.
The little boy arrived at the hospital with abdominal pain, and due to initial blood tests was at first suspected of being diabetic. He was therefore transferred to Strong Memorial Hospital. There it was determined through standard medical analysis that he was not diabetic, but according to a CAT scan, he had blood in his abdominal cavity. This established that a serious blunt force trauma had occurred to him. No one admitted seeing such a blunt force trauma accident. No one admitted to deliberately hurting the boy.
[*4]
The time of arrival at the hospital is not specified in the record. The hospital records are not in evidence. The little boy never told anyone what happened, and there is no testimony to establish that he was verbal enough to do so. The mother said when asked about what happened the boy said, "Hurt, hurt," but did not help identify the cause of the "hurt". The toddler was kept in the hospital for six days-a very significant amount of time.
 In those few weeks during which the mother's boyfriend served as babysitter, from May 5, 2005, until the July 1, 2005 hospitalization, A. D. presided over three noteworthy safety incidents involving the toddler. In or around May, the 2 ½ year-old boy fell off his "four-wheeler" and scratched his back while under A. D.'s supervision. A. D. testified that the "four-wheeler" was propped up against the boy's bed to try to prevent him from using it. Nonetheless, the boy had climbed on it while A. D. was out of the room-a reality a more responsible adult would have foreseen. Clearly, A. D. should have kept the active boy in his sight and kept obvious dangers out of his reach. A little later, about one month before the blunt force trauma, A. D. admittedly slapped the little boy in the face. A. D.'s testimony as to this incident was as follows:
Q. During the time that you were providing care to the child, did you have occasion to discipline X. in any way?
A. There was one time.
Q. When was that?
A. It was early summer, he had taken off his diaper, and he had diarrhea or whatever, crap in there, and he took it off in our bedroom. And then I had told him that he can't do that, and when I told him that, he got aggravated, and he smacked me, and I popped him back and told him you can't hit people.
Q. When you say you popped him would you tell us what you did?
A. I smacked him in his face like he smacked me. That was the one time I laid my hands on that child, I would also add to the Court.
Q. Have you ever had any conversation with Ms. N. A. about that incident?
A. Yes, I did. I called her and let her know what occurred. She was disappointed, and she said not to do that again, and I have never hit him since. (Emphasis added.)
The above is a startling example of inexcusable corporal punishment, administered when X. probably felt sick. A. D. should have been sympathetic, constructive, and quicker to change a dirty diapernot aggressive and punitive.
Only one and one-half weeks prior to the blunt force trauma at issue here, the little boy fell down some stairs while the respondent mother had entrusted her son to A. D.'s supervision. This occurred after A. D. had gone ahead of the boy into the apartment. He testified he was expecting his own grandmother to watch the boy. That supervision by A. D.'s grandmother apparently never materialized. The boy bumped his head and cried from this fall, but was determined by A. D.'s grandmother not to need a trip to the doctor.
The Department allowed the toddler to be returned to his respondent mother after recovering in the hospital, but a preliminary order of protection was obtained putting the child in the care and custody of his mother under the supervision of the Department, and requiring her to keep respondent A. D. away from the child. A. D. was required to obey an order of protection to have no contact with the child or any place the child might be found. There was no evidence that [*5]the orders of protection were violated or ignored.
EXPERT MEDICAL TESTIMONY
Dr. Blane, the most critical witness, and the only medical witness, testified to her developing understanding of the injury, as more and more facts and medical information became known, as more specific questions were asked of her. She wrote in her undated report which was made after the boy's July 6, 2005 discharge, and attached to the petition,
The blood in X.'s abdominal cavity is a sign of recent, significant trauma, most likely trauma that occurred within a 48 hours (sic) of his presentation to Rochester General Emergency Department. The fall down the stairs that X. had over a week before this presentation would not explain his condition. The elevated blood sugar that X. had on July 1, 2005 was most likely a stress response. X. does not have Diabetes.
While the respondents' attorneys do their best to undermine her testimony because she made different statements as to when the accident happened at different times, what her testimony revealed was objective, critical analysis, with answers appropriate for the specific questions. She testified she thought she could "narrow it down more than 48 hours because of the things that the child was alleged to have done. . . ". This led to her medical conclusion-that the trauma could not be explained by any known occurrence, and she did not think that 12 hours passed between the trauma and the vomiting, and "it even could have been an hour or two." (Oct. 31-Nov.1, 2005 transcript, p 91, hereinafter "Transcript".) She testified she thought it occurred between 8:30 and 11:30 AM on July 1, 2005, saying " I think that's more likely than him being injured the night before, especially based on the blood sugar and the fact that there were no ketones in his urine." (Transcript, p 92.) She stated, "that his symptoms all seemed to happen on the morning of his presentation, would make me think most likely what happened to him happened pretty close to the time he presented to the hospital." (Transcript, p 82.) She admitted she thought it could have happened in the middle of the night Thursday night, but not in the middle of the day Thursday, (Transcript, p 100). However, there was no evidence of any incident in the middle of this night, or other reason to believe there was such an incident.
Dr. Blane further testified that it was unnecessary to determine whether the liver or the spleen was bleeding in order to reach the conclusion that a blunt force trauma caused the internal bleeding. Dr. Blane learned of no blunt force trauma accident involving the boy in the week preceding the emergency trip to the hospital which could have involved the force required to cause the blood in his abdominal cavity. Significantly, Dr. Blane testified that stairwell falls do not cause of a lot of abdominal injury in children, and that she did not think there was any evidence that he had spleenic trauma from this stairway fall one week before July 1. (Transcript, p 105.) She opined, to a reasonable degree of medical certainty, that the fall was not a likely cause of the injury. (Transcript, p 83.) She testified,
The kind of trauma that would produce the finding that we saw would not be trauma that happened before he was eating chicken mcnuggets and playing. So, it happened afterward, sometime after the end of those activities. . . Transcript, pp 101-102)

The doctor explained that a child with abdominal trauma would not be likely to eat. (Transcript 1, p 82.) The doctor indicated some accident could have happened the evening before X. returned to the mother's home, but she had no knowledge of such an accident and did not believe an accident caused the injuries. The doctor's opinion remained that she thought 8:30 to 11:30 AM on July 1, 2005, was more likely the time of the injury-thus indicating A. D. was the only [*6]responsible person present. Indeed, common sense dictates it is far more likely that the trauma happened to the child when there was no one to witness what A. D. did-no mother and no people at a public playground who would come to his aid if he were hurt or cried.
Regarding the nature of the trauma she testified,
I think that there was some type of blunt trauma to the abdomen or the child could have been flung against a wall or on the floor. So, could I say, well, somebody punched him or kicked him or threw him on the floor or whacked him with an object, I couldn't say which of those things. It was - I think there was some type of blunt trauma to the abdomen that caused him to have the internal bleeding. (Transcript 1, p 92)
The trauma Dr. Blane describes above is clearly abuse. The doctor testified that in her opinion, given the known facts, little X. could not have accidentally injured himself so badly.
Dr. Blane also testified trauma causing this kind of injury but not leaving external marks is not an uncommon thing (Transcript, p 95), and added she would not necessarily try to relate the two small marks the child had on his chest (Transcript, p 99). She said, "The location of those marks wouldn't explain the bleeding that he had in his belly. Those marks were on his chest, not on his belly." (Transcript, p 108.) She further testified she thought there was probably bleeding from the liver (Transcript, p. 97), and that her opinion that there was a pooling of blood around the liver and in the abdominal cavity was based on another individual who was more experienced at reading CAT scans than she was (Transcript, p 115). The court takes judicial notice of the fact that this reliance is standard practice in the medical profession.
FINDINGS Had there been an accident before the child returned home, someone would have known about it and testified about it, particularly in the face of these abuse charges. Because there is no evidence of such an accident, the court finds there was none. To find otherwise would be wholly speculative. It must be concluded even from the three interested witnesses that at least one of the two respondents-i.e., the directly responsible respondentknows precisely what happened, because one of them was always present or within a proper range to be able to provide adequate supervision during the period when the injury occurred. Significantly, the respondents failed to even propose a plausible scenario which could have resulted in the boy's injury without the culpability of one of them. The evidence points to A. D. and no one else. First, he had known shortcomings as a care giver. Second, Dr. Blane's medical opinion that the injury virtually certainly must have occurred after the child was returned home around 8:30 PM Thursday, June 30, 2005, and most likely occurred not Thursday night, but Friday morning, July 1, 2005, in the few hours shortly before the boy was taken to the hospital, means A. D. was directly responsible. Thirdly, the lack of any evidence that the mother ever at any other time personally and directly harmed or neglected her son, decisively tips the evidentiary balance against the boyfriend A. D. in this matter. Accordingly, the court concludes, based on a preponderance of the credible evidence, that A. D. was the person directly responsible for the injury to X.-and that it occurred after the respondent mother went to work, while the boy was under A. D.'s sole and direct supervision.
CASE AGAINST A. D.
As stated in Matter of Brandyn P, 278 AD2d 533, 534-535 (3rd Dept 2000),
Abuse must be established by "a preponderance of the evidence" (Family Ct Act § 1046 [b] [i]) and Family Court Act § 1046 (a) (ii) "provides that a prima facie case of child abuse or [*7]neglect may be established by evidence of (1) an injury to a child which would ordinarily not occur absent an act or omission of respondents and (2) that respondents were the caretakers of the child at the time the injury occurred" (Matter of Philip M., 82 NY2d 238, 243).
X. certainly had an injury which would ordinarily not occur absent an act or omission of someone, and A. D. was in charge of X. when the injury occurred.
Unexplained injuries are prima facie evidence of abuse (e.g., Tania J., 147 AD2d 252). X.'s injuries remained unexplained by respondents throughout the trial. As stated in (Matter of Philip M., 82 NY2d 238, 244-245),
Once a prima facie case has been established, respondents may simply rest without attempting to rebut the presumption and permit the court to decide the case on the strength of petitioner's evidence or, alternatively, they may present evidence which challenges the establishment of the prima facie case. Their evidence may, for example, (1) establish that during the time period when the child was injured, the child was not in respondent's care (see, e.g., Matter of Vincent M., 193 AD2d 398, 403); (2) demonstrate that the injury or condition could reasonably have occurred accidentally, without the acts or omissions of respondent (see, e.g., Matter of Eric G., 99 AD2d 835); or (3) counter the evidence that the child had the condition which was the basis for the finding of injury (see, e.g., Matter of Smith, 128 AD2d 784, 785-786).
In accord Matter of Angelique M, 10 AD3d 659 (2d Dept. 2004). Although motivated to do so, respondents failed to establish any credible, possible explanation for the abdominal injury. Nor could his respondent/girlfriend help him in this regard. Dr. Blane's testimony helped establish the time frame of the injury and eliminated any reasonable possibility that little X. could have hurt himself so badly through an accident. According to comparable case law, A. D. must be found to have intentionally abused the boy under Family Court Act, § 1012(e)(i), not (ii), not simply to have neglected him.
The case law repeatedly holds that when a responsible person deliberately inflicts an injury on a child, it meets the statutory definition of abuse-even if the injury itself is not obviously serious and does not last for weeks or months or years (i.e., may not seem "protracted" in the common meaning of the word). The intentional nature of the injury-producing actions is more important than the fact that a person luckily did not actually do worse damage. In Matter of Angelique H (215 AD2d 318), a mother deliberately burned her child's hand on a hot stove to teach the child a lesson. This was found to be abuse because the burning created a substantial risk of serious injury as defined in FCA 1012(e)(i), even though the medical testimony did not indicate the actual injury was particularly serious or protracted. The importance of the risk of a bad injury versus the nature of the actual injury is also clearly demonstrated by Matter of Christina BB (291 AD2d 738), where the credible testimony established that the respondent shot a child in the forehead with a BB gun. While the actual injury was not terrible, the court noted the obvious risk of loss of eyesight made that an abuse case. (In accord, Matter of Michael S. (224 AD2d 277, supra), a child had numerous abrasions and burns which could not have occurred accidentally and were otherwise not credibly explained, the child was hospitalized one week, and the court found he was abused; see also Matter of Roy T., 126 Misc 2d 172, where a finding of abuse was made, based on five second degree cigarette burns, despite medical testimony that the injuries, though they could remain visible through scarring for up to 2 years, did not meet the statutory definition of FCA 1012[e][i]; cf. Matter of Reannie D., 2 AD3d 851, where the court found no evidence that the father inflicted injury on a child other than by accidental means.)
Based on the facts, the finding that respondent deliberately inflicted physical injury, and [*8]the law, X. is found to be an abused child, abused by respondent A. D. (Family Court Act. § 1012[e][i]).
CASE AGAINST MOTHER Although the mother is not found to have physically abused the child herself, she could under the statute be responsible for allowing the abuse. As stated in Matter of Carrie R., 156 AD2d 756 (3rd Dept 1989), "The appropriate test in deciding whether a parent allowed a child to be abused is whether a reasonable and prudent parent would have acted, or not acted, under the circumstances (see, Matter of Scott G., 124 AD2d 928, 929)." A comparison of fact patterns is helpful. In the Carrie R. abuse proceeding that mother admitted slapping the baby "pretty hard", and there were resulting bruises on the three-week old baby's head, but the father appealed a finding of abuse against him for his passive role. The record reveals that respondents had been the subject of child abuse petitions before, that at least one of their children had been removed from their custody, and that the father in his own sworn statement indicated he knew that the mother had threatened to hit the infant because she was losing patience with her. Nonetheless, that respondent chose to leave the infant alone with the respondent mother. The father's appeal was denied. (See also Matter of Tania J., 147 AD2d 252, mother found to have abused daughter when she knew boyfriend was sexually abusing her daughter, who had contracted a sexually transmitted disease.)
 If there had been an ongoing pattern of serious physical violence here, as in Matter of Marcos C. (186 AD2d 446 1st Dept 1992), the mother in the case at bar also could be found to have abused her son. If the record had shown she had no basis whatsoever for believing her boyfriend would abuse the child, and there was evidence of his loving and caring behavior around children, she would not be found to have abused or neglected X. (Matter of Kevin T., 181 Misc 2d 386).
The case at bar falls between the obvious cases, and it is this court's determination that the respondent mother's responsibility should lie between abuse and innocence-i.e., she should have expected respondent A. D. would neglect her child if left to supervise him. To find the respondent mother guilty of neglect only requires that the mother knew or should have known of imminent danger to her child if left with A. D. (Matter of Melissa U, 148 AD2d 862 (3rd Dept 1989). There need not have even been any actual injury to the child so long as the preponderance of the evidence supported a finding that the boy was placed in imminent danger of physical harm (Matter of Scott M., 284 AD2d 589). A. D. was a man with no children of his own and no record of successful child care experience. At the time of the blunt force trauma at issue herein, the respondent mother had continued to leave her son with A. D. despite two previous injury-producing accidents and one instance of corporal punishment which had occurred while he was supervising her son. The accidents demonstrated that A. D. himself had failed to provide adequate supervision. Furthermore, his one admitted case of corporal punishment, i.e., slapping the toddler in the face, demonstrated extremely poor judgment and inability to control his anger. Based on her son's experiences with her boyfriend, the respondent mother should have realized the little boy was at imminent risk of significant injury due to neglect when he was left alone with A. D. Accordingly, the court finds she failed to exercise a minimum degree of care to protect X. (e.g., Matter of Rita XX, 249 AD2d 850 [3rd Dept 1998]). Fortunately, after the abuse, this respondent mother acted promptly and wisely to take the child to the hospital and kept A. D. away from the boy as ordered after the incident.
NOW THEREFORE, for the reasons set forth above, it is
FOUND that facts sufficient to sustain the petition are established and the child X. (born 2002) is an abused child (Family Court Act, § 1051[a]), abused by respondent A. D., who inflicted [*9]non-accidental physical injury which caused protracted impairment of X.'s physical health (Family Court Act, § 1012[e][i]), and it is further
FOUND that facts sufficient to sustain the petition are established and the child X. (DOB 11/26/02) is a neglected child (Family Court Act, § 1051[a]), neglected by respondent/mother N. A., who failed to provide adequate supervision and guardianship (Family Court Act, § 1012[f][i][B]), and it is further
ORDERED that the dispositional hearing in this matter shall be held before this Court on ____________ , 2006 at ____AM/PM.
DATED: March 29, 2006_____________________________
Rochester, NY
HON. MARILYN L. O'CONNOR,
FAMILY COURT JUDGE
NOTICE: Pursuant to section 1113 of the Family Court Act, an appeal must be taken within thirty days of receipt of the order by appellant in court, thirty-five days from the mailing of the order to the appellant by the clerk of the court, or thirty days after service by a party or law guardian upon the appellant, whichever is earliest.
MAILED OR HAND-DELIVERED: Charles Baisch, Esq., Daniel Aureli, Esq., James E. Brown, Esq., Sue Laragy, Esq., Christine Redfield, Esq.